**UNITED STATES of America, Plaintiff,**

v.

**Benjamin Legon CRUMPLER,
Defendant.**

**No. H Cr 83–36.**

United States District Court,
N.D. Indiana,
South Bend Division.

June 10, 1986.

William Grimmer, Asst. U.S. Atty., South Bend, Ind., for plaintiff.

Mark Krasnow, Miami, Fla., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

#### A.

■ The double jeopardy clause of the Fifth Amendment of the Constitution of the United States protects against a second prosecution for the same offense after acquittal.

In this case the original indictment was filed on July 7, 1983 and the full indictment is marked Appendix A * and is attached hereto and incorporated herein.

On June 7, 1985 a superseding indictment was filed in this case in five counts charging only Benjamin Legon Crumpler and is attached as Appendix B.* (It was conceded in open court by counsel for Crumpler that Counts IV and V of the superseding indictment filed on June 7, 1985 in this case were not subject to dismissal on double jeopardy grounds.)

The defendant, Benjamin Legon Crumpler, was also charged in an indictment filed in the Central District of Florida at Tampa on July 26, 1984 and is attached as Appendix C.* There was a superseding indictment to correct only typographical errors in Tampa of which this court is familiar and that indictment is attached hereto, marked Appendix D,* for purposes of clarity.

This court held an extensive evidentiary hearing in this case at the explicit request of the defendant, which hearing was held on February 10, 11, 12 and 13, 1986, and a

* Appendices not included for publication.

full and complete transcript of the same has been prepared and filed totaling 681 pages, which transcript has been carefully examined by the court and has been available to both counsel for the government and counsel for the defendant. In addition to which this court, at the express request of defense counsel, heard final oral arguments on the 25th day of April, 1986, which oral arguments lasted approximately one and one-half hours.

The salient fact in this case that creates the double jeopardy argument of the defendant is this defendant's acquittal of the superseding indictment in Florida on May 21, 1985. He now argues here that the double jeopardy clause prohibits the prosecution of Counts I, II and III of the superseding indictment filed in this case.

A facial examination of the indictment upon which this defendant was acquitted in Florida and the indictment upon which he is currently charged in this district fails to reflect a double jeopardy preclusion.

■ In spite of this court's repeated requests and admonition both the defendant Crumpler and the United States of America, for reasons best known to each of them, declined to put before this court a transcript of the evidence in the case tried in Tampa, Florida. It is this court's belief that such failure must be primarily charged to the defendant since the defendant had the burden of proof on the double jeopardy issue in the hearing before this court. Nonetheless its absence presents serious problems to the proper disposition of this double jeopardy issue *at this time*.

Given this record with its apparent deficiencies this court must attempt to sort through the facts presented to determine whether in fact the present prosecution is for the same offense for which this defendant was acquitted in Tampa, Florida. The difficulty inheres in the nature of the offense and not in any conceptual problems with the double jeopardy clause. The appli-

cation of the double jeopardy clause is clear and the kind of conceptual problems that are reflected most recently in *United States v. Jefferson*, 782 F.2d 697, (7th Cir. 1986) are not here present. The problem inheres in the factual nature of conspiracy and continuing criminal enterprise offenses. The court must make an extensive dissection of the factual record in this case before proceeding to the necessary conclusion under the Fifth Amendment of the Constitution of the United States.

Defendant was earlier charged in an indictment by the Southern District of Indiana in the mid-seventies. He fled the country and remained a fugitive until his arrest June 1, 1984.

On July 7, 1983, a United States Grand Jury, sitting in the Northern District of Indiana returned an indictment (hereinafter Indiana Indictment) against Benjamin Legon Crumpler (hereafter defendant). Forty other defendants were indicted as well.[1] Defendant was charged in Count Three with a violation of 21 U.S.C. §§ 952(a), 963, conspiring to import marijuana and cocaine into the United States, and in Count Four with a violation of 21 U.S.C. §§ 841, 846, conspiring to distribute and possess with the intent to distribute marijuana and cocaine. The dates on the original Indiana indictment read as follows: "Beginning during the early summer of 1977, the exact date being unknown to the Grand Jury, and continuing thereafter up to or about January 20, 1983, in the Northern District of Indiana and elsewhere." A superseding indictment was returned against the defendant on June 7, 1985, charging him in five counts: Count 1 charges him with a violation of 21 U.S.C. § 848, operating a Continuing Criminal Enterprise (hereafter CCE); Count 2 with a violation of 21 U.S.C. §§ 952(a), 963; Count 3 with a violation of 21 U.S.C. §§ 841(a)(1), 846; Count 4 with a violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2; Count 5 with a violation of 18

---

1. This case has spawned much published legal literature. See *U.S. v. Molt*, 772 F.2d 366 (7th Cir.1985); *U.S. v. Markowski*, 772 F.2d 358 (7th Cir.1985); *U.S. v. Greenberg*, 772 F.2d 340 (7th Cir.1985); *U.S. v. Chiattello*, 599 F.Supp. 970 (N.D.Ind.1985) (Denying release pending appeal); *U.S. v. Markowski*, 582 F.Supp. 1276 (N.D.Ind.1984) (Denying Bail).

U.S.C. §§ 1952, 2. The dates alleged in the superseding indictment read as follows: "From in or about March, 1978, and continuing thereafter up to and including in or about January, 1981, the exact dates being unknown to the Grand Jury, in the Northern District of Indiana and elsewhere." On June 11, 1985 defendant was arraigned on the superseding indictment and pled not guilty to all counts.

The defendant had also been indicted on July 26, 1984 by the Middle District of Florida (hereafter Tampa indictment) wherein he was charged with a violation of 21 U.S.C. § 848, CCE, as well as 21 U.S.C. §§ 841(a)(1), 846, 952, 963 and 18 U.S.C. § 2. Defendant was acquitted of all charges there on May 21, 1985. The time frame in the Tampa indictment read as follows: "On or beginning in or about the month of February, 1982, and continuing thereafter up to and including August, 1983, in the Middle District of Florida, and in diverse other districts," this defendant and others did engage in a CCE.

The defendant challenges the charges in the Indiana indictment alleged in Counts 1, 2, and 3 on the basis of double jeopardy. Defendant does not here contend that Counts 4 and 5 are impacted by the court's ruling on his Motion to Dismiss as Barred by Double Jeopardy.

■ This court held an evidentiary hearing on defendants' Motion to Dismiss. This court must decide this issue based solely on the record before it which includes all pleadings, affidavits, and the evidence adduced during that evidentiary hearing. This court does not have before it a copy of the transcript of the Tampa trial since neither side deemed it important enough to their case. Suffice it to say, that transcript is not before this court for the determination of the issue of double jeopardy.

At the evidentiary hearing, the defendant testified at great length on his own behalf and he called Jerome Frese, the former Chief Assistant United States Attorney involved with the Indiana indictment and prosecution in support of his motion. In opposition to the motion the government presented the following witnesses: Delbert Woodburn and Ernest S. Jacobsen, Chief Investigators from the Tampa indictment; William Tipping, Shelly White, George Anthony (Tony) Hicks (hereafter Tony Hicks) and Charles Kehm, all named as co-conspirators from the Indiana indictment. The parties have also entered into several stipulations.

It is the defendant's contention that all of his illegal smuggling activities from 1977 to 1983 was part of one overall scheme, a single overreaching conspiracy to smuggle and distribute drugs in the United States. The defendant testified to his massive participation and involvement in the crimes charged in the Indiana and Tampa indictments. However, he claims that the government was not aware of all of his activities. He contends that his organization and its overall plan to distribute and smuggle drugs to the United States continued in substantially the same form the entire time from 1977–1983 but for the shifting cast of players (the individuals participating in the activities)

### B.

The following is a more specific summary of the facts before this court.

The defendant testified that he was involved in 25–30 overt acts giving rise to the charges in the Indiana indictment and in 10 overt acts giving rise to the charges in the Tampa indictment.

At different times under different agreements, with different objectives became involved with and associated with the following various individuals and their organizations for smuggling purposes: John Sharp, John Eddie, Thomas Fife, Ronald Markowski, John Arnold, Frank Brady, Stafford Morrison, Bill Baron, Charles Kehm, Norman Williams, and Francisco (Paco) Riveroll.

Defendant testified that his involvement with controlled substances in 1975 in the Southern District of Indiana was unrelated to any of his subsequent illegal drug activi-

ties. Defendant, while a fugitive, lived in Colombia, South America, where he became familar with drug smuggling activities and where he learned to speak Spanish fluently. Defendant testified that his first couple of smuggling ventures occurred in 1977 when he was approached to load a boat of marijuana. He said that John Arnold, Don Thone, Thomas Fife, John Eddie, Greg Poe, and a couple of others whose names he did not recall helped in the smuggling venture. The objective of the venture was to smuggle Colombian marijuana into the United States. This same group of individuals attempted another venture but was unsuccessful.

In March of 1978, Defendant was approached by a Hiram Aaron regarding an airplane for hire. Aaron introduced defendant to Julio Guell, a mechanic operating out of Miami, Florida, who then introduced defendant to Ronald Markowski (hereinafter Markowski). Markowski agreed to serve as a pilot for the defendant in a smuggling venture of 1200 pounds of Colombian marijuana. Markowski also introduced defendant to Charles Smith, another pilot. Other individuals involved in the venture were: John Arnold, Thomas Fife, John Eddie, and Charles Smith. This incident comprised the facts alleged in the first overt act of the Indiana indictment. The aircraft used was the Beach D18. Markowski then developed his own organization and joined forces with the defendant as a partner. The two entered into a partnership agreement to smuggle Columbian marijuana into the United States.

Markowski then introduced the defendant to Bill Baron (hereinafter Baron) and Baron's organization joined in with Markowski and the defendant in the fall of 1978. In 1979 Baron and the defendant had a falling out after a smuggling venture in which $500,000 came up missing and they quit their partnership. However, while smuggling together, Baron, Markowski, and defendant, their objective was to smuggle Colombian marijuana into the United States through the Bahamas. During their smuggling ventures, the three of these individuals were involved with brib-ing Bahamian officials through a Nassau Attorney, Nigel Bowe. The bribery was to secure bond and dismissal of charges against individuals arrested in connection with drug smuggling, release of boats or aircraft confiscated, and to secure passage through the Bahamian area during the smuggling operations (i.e. the arrest of several persons at Green Cay, Bahamas, involving a boatload of marijuana). The bribery also was to secure the use of airstrips for refueling purposes.

The defendant testified that his role during his partnership with Baron was to secure the marijuana in Colombia and ship it to Baron for the offloading.

After Baron and defendant ended their partnership, Markowski and defendant became partners and they formed a bogus company, named Marlowe Internation, (for Terry Lowe, the defendant's alias at the time, and Ronald Markowski) with the aid of Florida Attorney Steven Greenburg. The bogus company had a fictitious president named Mitch Aspra. George Anthony (Tony) Hicks (hereinafter Hicks), an individual who worked with the defendant during this time period signed the legal documents as president, using the name, Mitch Aspra. The Company was then used to purchase an airplane for smuggling purposes, and a bogus lease was made to non-existent individuals, in order to reclaim the aircraft in the event it was ever confiscated by the authorities. The sole purpose of the Markowski and defendant partnership was to smuggle Colombian marijuana into the United States. Other key participants with Markowski and defendant included: Tony Hicks, Steven Greenburg, John Sharp, Charles Kehm, Bill Tipping, Bob LeRoy, Charles Rewis, and Danny Bryant. Defendant testified that he organized, supervised and managed the obtaining of the marijuana, securing the landing, the landing site in Colombia and distributing the marijuana in the states to the salesmen.

In the summer of 1980, Markowski and defendant had a falling out. Defendant then started working with another smug-

gler, Frank Brady. It was during this time period in which the only incident of cocaine listed in the Indiana indictment occurred. This incident did not involve the defendant in the same kind of smuggling as all of his previous ventures had. A James Casey contacted the defendant to sublease Cat Island (an island the defendant had leased to aid him in his smuggling ventures) for the purpose of refueling his aircraft. Defendant sublet the island for two trips that Casey was involved with, and defendant had nothing else to do with these two trips. He did not assume any position of organizer, supervisor, or manager in relation to the trips Casey made. Casey then gave defendant two kilos of cocaine for each trip as payment for the sublease of the island.

Defendant was introduced to Stafford Morrison, another smuggler with an organization, in September of 1980, and began a partnership with him. Morrison and the defendant planned a smuggling venture of 18,000 pounds of marijuana from Colombia on a trawler named the Adventurer. Most of the proceeds from this venture ended up in the hands of law enforcement officers during any incident with a rental car in January 1981, which caused the eventual end of the Morrison-defendant partnership.

Markowski had come back in September 1980, and planned another trip with defendant involving Morrison (who Markowski said he did not trust) to smuggle 1800 pounds of marijuana. Markowski and defendant had another falling out which ended their partnership.

The Colombian sources which defendant utilized during all of these smuggling ventures were Moises and Danielle Andrews, predominately as well as Carlos Alarte, Marcos Alarte and Roberto Peinado. The purpose of each of these ventures was to smuggle marijuana from Colombia through the Bahamas into the United States. The locations used during these ventures varied at times and included: Cat Island, Samson Cay, Caicos Island, Great Exuma, Ben Hill County, Georgia, Cat Cay, Fort Lauderdale, Florida, Martin County, Florida, Colombia, South America, Bahamas, Ft.

Myers, Florida, Immokalee, Florida, Green Cay, Island of Bimini, Lake Okeechobee, Florida, Long Cay, and Andros Island.

The vehicles used by the defendant and his co-conspirators from March 1978 through January 1981 included: Aztec aircraft 808P; Rio Grande-freighter; and several cigarette boats; Coral Star-fishing vessel (originally named the Peola); Cessna 310; Cessna 402; Bell Jet Ranger Helicopter; Beach Baron Piper Aztec; Hairy Cary, 32 foot carrier; Adventurer, trawler (later renamed the Grande Celeste), 38 foot scarab boat; Dolly Dimple, 36 foot lobster boat.

Defendant then testified to about 6 smuggling ventures which he claims were unknown to the government and through which he attempts to establish the overlap between the involvement of the co-conspirators in the Indiana indictment with the co-conspirators of the Tampa indictment.

Defendant met Norman Williams in a social setting in 1979. Then on Christmas Day in 1980, a boat smuggling Jamaican marijuana owned by Norman Williams became stranded near Samson Cay in the Bahamas. Defendant responded to a stress call from the boat and decided to assist them in finding safety and in unloading the marijuana. This incident later became referred to as the "chicken coop" incident. The marijuana had been stored in a chicken coop and subsequently stolen by local inhabitants. The smuggler lost most of the marijuana. After this incident, Williams and defendant became smuggling partners. Morrison, Williams and defendant engaged in smuggling activities together for a short period of time before Morrison quit smuggling with the defendant in 1981.

It was in the early part of 1981 when defendant went to California and met one San Francisco Bob in an effort to make arrangements for new smuggling ventures.

While smuggling with Williams, defendant met Rico Browning, Ray & Liso (L/N/U), Ricou DeShaw, and Dickey Lynn. Dickey Lynn introduced defendant to Francisco (Paco) Riveroll and Buddy Ellis (the core participants in the Tampa indict-

ment) in June of 1982. Riveroll, Williams, Lynn and defendant began a partnership forming the bases for the Tampa indictment and started smuggling large quantities of cocaine from Colombia to the United States, Riveroll, a Mexican national, had strong connections with the Ochoa family in Colombia. Defendant's role was to supervise, manage and organize his airplanes and pilots to pick up the cocaine in Colombia and airdrop it at designated locations to be smuggled into the United States.

There were several attempts, both successful and unsuccessful, which involved the smuggling of Colombian cocaine, and Jamaican marijuana, from their respective locations, which involved various agreements, for various smuggling ventures, at various times. Other individuals conspiring with defendant during these smuggling ventures and serving in various capacities from February 1982 through August of 1983 were: Dickey Lynn, Norman Williams, Francisco (Paco) Riveroll, Joe Resch, Ricou DeShaw, Russ Morris, Jimmie Boyd, Fred Jenner, Parker Priest, Walter Moyihan, Richard Kniffen, Wanda Kniffen, Jack Kartee, Kevin Seehan, Buddy Ellis, Claude Denise and Richard Knauer.

The vehicles used during the smuggling ventures from February 1982 through August 1983 were: 26 foot Ramoni boat; 30 foot Island Hopper; Westwind, a trawler with secret compartments; several speed boats; Cessna 182; Aztec, N550US; Cessna 206; PBy plane and two new aircraft.

The locations used during this time period included: Mongego Bay, Jamaica; Florida Keys; South Miami, Florida, Bance, Colombia, Dade County, Florida; Ft. Myers, Florida; and Cancun, Mexico.

The objective of the conspirators involved with the Tampa indictment was the smuggling of Colombian cocaine and Jamaican marijuana into the United States. The main sources of these drugs were Francisco (Paco) Riveroll and the Ochoa family. The conspiracy in the Tampa indictment and the smuggling ventures involved therein did not depend on the bribery of Bahamian officials since the Baha-

mas were used only infrequently and the conspirators had made the conscious decision to smuggle cocaine predominately instead of marijuana since it was more profitable and was easier to smuggle. The events of smuggling between February 1982 and August 1983 were carried out by airdropping.

Further testimony included defendant's admission that guns (i.e. Mach 10) were used during the smuggling ventures. He further testified that he had (in rough estimate) grossed about 25 million dollars, which included the successful importation of approximately 150,000 pounds of marijuana and 1100 kilos of cocaine into the United States.

## II.

The Supreme Court in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), has set forth succinctly the three separate constitutional protects guaranteed by the Fifth Amendment of the Constitution against double jeopardy. The Court held those three protections to be (1) against a second prosecution for the same offense after acquittal, (2) against a second prosecution for the same offense after conviction, and (3) against multiple punishments for the same offense. *North Carolina v. Pearce, supra* at 717, 89 S.Ct. 2076. See also, *Poland v. Arizona,* —— U.S. ——, 106 S.Ct. 1749, —— L.Ed.2d —— (1986).

Where successive prosecutions are at stake, the guarantee serves a "constitutional policy of finality for the defendant's benefit," *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221 at 2225, 53 L.Ed.2d 187 (1977) citing *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971). That policy protects the accused from attempts to relitigate the facts underlying a prior acquittal, *see Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). *Brown v. Ohio, supra* 97 S.Ct. at 2225. The *Brown* Court further stated at 432 U.S. 165, 97 S.Ct. 2225:

Because it was designed originally to embody the protection of the common-law

pleas of former jeopardy, see *United States v. Wilson*, 420 U.S. 332, 339–40, 95 S.Ct. 1013, 1019–1020, 43 L.Ed.2d 232 (1975, the Fifth Amendment double jeopardy guarantee serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial. (footnote omitted)

The Court in *Ashe v. Swenson, supra,* citing *Green v. United States*, 355 U.S. 184, 190, 78 S.Ct. 221, 225, 2 L.Ed.2d 199 (1957) reiterated that for whatever else that constitutional guarantee may embrace, (cite omitted), it surely protects a man who has been acquitted from having to "run the gauntlet" a second time.

The Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units. *Brown v. Ohio*, 432 U.S. 161, 169, 97 S.Ct. 2221, 2225; *cf. Braverman v. United States*, 317 U.S. 49, 52, 63 S.Ct. 99, 87 L.Ed. 23 (1942).

▮ In claiming double jeopardy based on more than one conspiracy prosecution, a defendant bears the burden of establishing that the prosecutions are for the same offense in law and in fact. The task is not an easy one because "[b]y the nature of the crime, the precise bounds of a single conspiracy seldom will be clear from the indictment alone. The gist of the crime of conspiracy and the characteristic which defines its breadth is the unlawful agreement." *United States v. Castro*, 629 F.2d 456, 461 (7th Cir.1980) citing *United States v. Marable*, 578 F.2d 151, 153 (5th Cir.1978)

"A defendant claiming that he has been subjected to double jeopardy bears the burden of establishing that both prosecutions are for the same offense.... The defend-

ant must show that 'the evidence required to support a conviction on one indictment would have been sufficient to warrant a conviction on the other' indictment." *United States v. Roman*, 728 F.2d 846 (7th Cir.1984); *United States v. West*, 670 F.2d 675, 681 (7th Cir.1982); *United States v. Buonomo*, 441 F.2d 922, 925 (7th Cir.), *cert. denied*, 404 U.S. 845, 92 S.Ct. 146, 30 L.Ed.2d 81 (1971). Although other circuits shift the burden to the government once the defendant has made out a nonfrivolous claim of double jeopardy, *United States v. Jabara*, 644 F.2d 574 (6th Cir.1981); *United States v. Stricklin*, 591 F.2d 1112 (5th Cir.) *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979); *United States v. Imnon*, 568 F.2d 326 (3d Cir.1977); *United States v. Papa*, 533 F.2d 815 (2d Cir.), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976), this Circuit has not so shifted the burden with regard to the double jeopardy claim.

This court is not faced with the double jeopardy questions concerning a retrial of the defendant on the same charge after a mistrial, *cf. United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, or after a conviction is reversed, *cf. United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), or the dismissal of the indictment or information, *cf. United States v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), or the permissibility of separate prosecutions on closely related charges when the defendant opposes a consolidated trial, *cf. Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), or whether one offense is a lesser included offense of the other offense, *cf. Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221 and *Garrett v. United States*, —— U.S. ——, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). *See, Garrett v. United States, supra,* for a detailed discussion of the legislative history of the continuing criminal enterprise offense.

The Seventh Circuit in *United States v. Buonomo, supra,* has set forth a modified version of the "same evidence" test,[2] look-

---

**2.** Other circuits have applied similar tests. *See, United States v. Robinson*, 774 F.2d 261 (8th

Cir.1985): *United States v. Sinito*, 723 F.2d 1250 (6th Cir.1983); *United States v. Booth*, 673 F.2d

ing to the "totality of the circumstances" for the defendant to prove that the first and second alleged conspiracies are one and the same. *United States v. West, supra; United States v. Castro, supra.* The Court in *United States v. Castro, supra,* while addressing the issue of the "same evidence" test said:

. This test, however, would seldom prevent multiple prosecutions in narcotics conspiracy cases such as this one, because the Government can shape the overt acts charged in each indictment and thus, under the guise of prosecutorial discretion, advance the proposition of one conspiracy's being capable of proof in several prosecutions requiring different evidence for each conviction. To determine whether a conspiracy has been subdivided arbitrarily, resulting in multiple indictments for a single illegal agreement, courts therefore will look to both the indictments and the evidence and consider such factors as whether the conspiracies involve the same time period, alleged co-conspirators and places, overt acts, and whether the two conspiracies depend on each other for success. Where several of these factors are present, the conclusion follows that the alleged illegal combinations are not separate and distinct offenses. *United States v. Marable, supra,* 578 F.2d at 154; *United States v. Mallah,* 503 F.2d 971 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975); *United States v. Cooper,* 442 F.Supp. 1259 (D.Minn.1978).

*Id.,* at 461.

### III.

This court must now look to the record before it and make a determination as to whether the CCE on which defendant was acquitted in Florida, and the CCE alleged in the present indictment are separate CCE charges or are one.

27 (1st Cir.) *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982); *United States v. Marable,* 578 F.2d 151 (5th Cir.1978); *United*

### A.

### TIME PERIOD

The original Indiana indictment charged defendant with conspiracy extending from June of 1977 until January 1983. The superseding Indiana indictment charged defendant with CCE and conspiracy extending from March 1978 through January 1981. The Tampa indictment charged defendant with CCE extending from February 1982 through August 1983. The original Indiana indictment charged defendant with first conspiring with the other defendants indicted in March of 1978, and his last involvement with the indictment in June of 1980. The defendant's testimony during the evidentiary hearing corroborated the fact that his partnership with Markowski ended in late 1980. Other testimony from named co-conspirators, William Tipping, George Anthony (Tony) Hicks, and Charles Kehm, corroborated the fact that there was a definite split between defendant and Markowski in late 1980, or early 1981. Jerome Frese, former Assistant United States Attorney in charge of preparing both the original and superseding indictments in Indiana testified that the superseding indictment was not carved out from the original indictment in an effort to guide around a double jeopardy problem. Rather, he testified that the superseding indictment reflects the actual involvement and time frames in which the defendant was involved. Frese testified that the surplusage of time which was omitted (that time charged in the original indictment in which this defendant was not actually involved) because of prior rulings of the district court to exclude material not directly related to the individual charged (during co-conspirator trials). Frese also testified that the date of January of 1983 as the ending date of the conspiracy in the original indictment related to a meeting between two other co-conspirators and that there was no indication that this defendant

*States v. Mallah,* 503 F.2d 971 (2d Cir.1974) *cert. denied* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975).

was in any way involved with the charges in the indictment after 1980.

Based on the face of the indictments before this court and the evidence presented during the hearing this court finds that there is no overlap in the time periods charged in the indictment here and the one in Tampa.

## B.

### PARTICIPANTS

■ The co-conspirators charged in the original Indiana indictment were: William Armbrister, John Edward Arnold, George W. Baron, Jerry P. Byrne, Candilairio (L/N/U), Ronald Dale Carlisle, George J. Chiatello, Robert Lomont Crockett, Benjamin Legon Crumpler, Vincent D'Angelo, Daniel (L/N/U), Eric Darrell Demchak, Jack Raymond Devoe, Phillip Michael Eckard, Thomas Layton Fife, Steven M. Greenburg, Larry Hall, Andrew W. James, Charles Kehm, III, Walter Reed King, John Kinoff, Willie Valerie Lae, Robert Roland Leroy, Kurt Edward Malerich, Oswaldo Llerna-Manjarres, George Margetis, Pamela Marakowski, Ronald Edward Markowski, James McBay, Edward Patrick McGarry, James Wesley Millsap, Moses (L/N/U), Emerson Molte, Mark Reitz, Lester Ritter, John William Sharp, David Arthur Short, Leon Richard Sokolinski, Richard Sokolinski, Paul Thompson, and William Tipping.

Co-conspirators charged in the Tampa indictment were: Benjamin Crumpler, a/k/a Terry Lowe, a/k/a Terry Crumpler, Katy Davis, James Ellis, a/k/a Buddy, Andrew Kniffin, Richard Kniffin, Beth Koehler, Wanda Luck, Walter Monahan, a/k/a Monahan, Parker Priest, Francisco Riveroll, a/k/a Paco, and Luis Riveroll. It is very obvious from looking at those charged in the two indictments that there is no overlap. However, the defendant testified that there were others involved in his smuggling ventures, particularly smuggling ventures he testified occurred between the dates charged in the two indictments, i.e. January of 1981 through February 1982, which he claims the overlap occurred. He claims that individuals unknown to the government who helped smuggle during the time period of the Indiana indictment continued to smuggle to smuggle with him during January 1981 through February 1982 in ventures also unknown to the Government. He claims these unknown individuals smuggled with various individuals who later smuggled with or became the principal participants in the smuggling ventures in the Tampa indictment.

Other defendants testified were involved in the Indiana indictment charges were: Claude Denise, Stafford Morrison, Steven Wrinkle, George Anthony (Tony) Hicks (an unindicted co-conspirator), Jimmie Pearce, Franz Gabrielle, Mike Nixon, Frank Brady (an unindicted co-conspirator), Pat Curry, Tommie Goodwin, Bob Jenkins, Wayne Bauer, Danny Bryant (an unindicted co-conspirator), Bud Molt, and Julio Guell. Those defendants testified were involved in the Tampa indictment not charged as defendant were: Jack Karatee, Morris, Fred Jenner, James Boyd, Ricou Browning, Norman Williams, Dickey Lynn, Richard Knauer, San Francisco Bob, Joe Resch, Ricou DeShaw, Adolpho Riveroll, Julio Guell, and the Ochoa family.

Of those individuals charged in the Indiana indictment, defendant testified that Bill Baron, Charles Kehm, John Arnold, Bill Tipping, and Bob Leroy were involved in roles that overlapped with individuals charged in the Tampa indictment. Charles Kehm testified that he was no longer involved with the defendant after the "Adventurer" incident in 1980 and defendant later testified that Kehm was not involved in the Tampa case. Bill Tipping likewise testified that he was no longer involved with defendant after his venture of smuggling with Markowski and defendant. The only contact defendant testified these two had was a conversation at Sunny South with regard to Bob Jenkins, a pilot. Unindicted co-conspirator Hicks testified that defendant had a falling out with John Arnold in 1981. Defendant testified that Arnold quit smuggling in 1981 and Arnold showed back up in 1983. Both the defend-

ant and Charles Kehm testified that defendant and Baron had a falling out in 1979. Defendant also testified that he introduced Baron to Norman Williams in 1981 for the sole purpose of selling Williams some leftover marijuana they had from one of their previous ventures. Defendant claims Bob Leroy, a co-defendant in the Indiana case, reappeared in early 1981 with regard to some marijuana given to his brother-in-law to sell after had had not been named as a participant since late 1979. Defendant testified that with the exception of John Arnold the individuals he was smuggling with in 1982 were completely different from those he smuggled with in 1979 and 1980.

Other evidence produced during the hearing included the testimony of Delbert Woodburn, police sergeant for the Metro Dade Police Department, Dade County, Florida, that the agents on the case were unaware of any overlap of participants in the two cases, and stipulation that Don Lewis, an Assistant United States Attorney, Middle District of Florida, would testify that there was no evidence presented in the Tampa trial which mentioned the overt acts set forth in the Indiana indictment, Counts 2 and 3.

Defendant is the sole individual named in both indictments and the only common conspirator between the two distinct groups of defendants. Defendant testified that his main suppliers for the overt acts alleged in the Indiana indictment were: Moises and Danielle Andrews, Marcos Olarte, Pedro Dabula, and Alfredo Maya. He further testified that his main suppliers of drugs for the basis of the Tampa indictment were Franciso (Paco) Riveroll and the Ochoa family.

Defendant testified to the following smuggling partnerships and core conspirators: John Eddie, Thomas Fife, John Arnold, Gary Poe, and defendant in 1977 and early 1978, (2) Fife, Eddie, Markowski, Arnold, Charles Smith and defendant, starting in March of 1978 through early fall of 1978, (3) Fife, Bill Baron, Candido Santiago, Arnold, Charles Kehm, Bob Leroy, and de-

fendant from early fall 1978 through fall of 1979, (4) Markowski, Bill Tipping, Arnold, Kehm, George Anthony Hicks, Leroy and defendant, for the fall of 1979, (5) Markowski, Hicks, Kehm, Charles Rewis, Danny Bryant, John Sharp, and defendant, late 1979 through May 1980, (6) Kehm, Ronald Elliott, Frank Brady, Franz Gabrielle, Markowski, Rewis and defendant from summer of 1980 through fall of 1980, (7) Stafford Morrison, Franz Gabrielle, Kehm, Arnold, Steven Wrinkle, from fall of 1980 through January 1981, (8) Norman Williams, Morrison, San Francisco Bob and defendant, early 1981 to early fall 1981, (9) Dabula, Wrinkle, Joe Resch, Jimmie Boyd, Ricou Browning, Ray & Lisa, Ricou DeShaw, and defendant fall 1981, (10) Wrinkle, Williams, DeShaw, Browning, Mike Nixon, Tommie Goodwin, Boyd from winter of 1981 to early summer of 1982, (11) Riveroll, Dickey Lynn, Williams, and defendant, summer of 1982 through spring of 1983.

It is very clear that there is a distinct break in the core participants between those participants prior to December 1980 and January 1981 and the participants from early 1981 on. A few of the participants float in and out but none of the core participants or partners, with the very vague participation of John Arnold in 1983 and the brief encounter between Bill Tipping and the defendant in 1982, overlap in any sense. The few individuals participating in smuggling ventures with defendant on which he attempts to show overlap between the two indictments (i.e. Baron episode and Tipping) do not effectively do so. Furthermore, these occasions of participation occur during the lapse of time between the two indictments, and are solely based on the defendants testimony.

The manner in which defendant really attempts to establish an overlap of participants is between non-core conspirators of the Indiana case participating in the first Adventurer venture and the 1980 Christmas Day rescue attempt for another boat and the participants of the smuggling ventures which took place during January 1981 through February 1982 who either became

participants in the Tampa case or introduced defendant to the individuals who became his partners in the Tampa case. Not one of the core-conspirators remained the same between the two indictments.

Defendant has not established that there was any consequential overlap between the participants involved with the Indiana indictment charges with the participants involved with the Tampa indictment charges.

Defendant relies heavily on the concept that the continuity of conspiracy does not require perfect continuity of membership, and that some conspirators may join or drop out during the course of a single conspiracy. *United States v. Balistrieri,* 779 F.2d 1191 (7th Cir.1985); *United States v. Lynch,* 699 F.2d 839 (7th Cir.1982). Unlike the facts in *Ballistrieri,* the defendant here has not shown that a core of participants were involved throughout the entire time frame he claims one single conspiracy existed. In fact, the core of participants altered drastically between the two indictments. There was not one core participant which was the same in both indictments. The fact that defendant heavily participated with different organizations and different core groups of participants at different times does not establish that there existed one overreaching conspiracy.

testified he would testify that after having reviewed a copy of the Indiana indictment that no evidence was presented during the trial in Tampa which mentioned the overt acts set forth in the Indiana indictment in Counts 2 and 3.

Further evidence at the hearing by Special Agent Jacobsen of the DEA in Miami, Florida, indicated that after having reviewed the Indiana indictment, based on his knowledge of the events which occurred at the Tampa trial, there was no evidence introduced at the Tampa trial concerning the overt acts alleged in the Indiana indictment. Without the Tampa trial transcript in this record, and based on the evidence presented, there is nothing in the record to establish that any overlap in the overt acts charged exist.

As to the statutory offenses charged, the defendant was charged with violating 21 U.S.C. §§ 841(a)(1), 846, 952, and 963 and 18 U.S.C. § 2 in a five count indictment in Tampa on which he was acquitted. Defendant was charged with violating 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 963, and 848, and 18 U.S.C. § 2 in a three count indictment in Indiana. With the exception of the charge of violating 21 U.S.C. § 843(b) in the Indiana indictment the statutory offenses charged are the same.

### C.

### CRIMINAL OFFENSES AND OVERT ACTS CHARGED

The Tampa indictment contained three counts, none of which consisted of any alleged overt acts. The superseding Indiana indictment alleges 25 overt acts. The defendant admitted that not one shred of evidence concerning Ronald Markowski and Bill Baron and the early smuggling ventures of 1977, 1978, 1979, 1980, up to and including September of 1981, was introduced into the Tampa trial, particularly any of the alleged overt acts in the Indiana indictment. The parties entered into a stipulation which was accepted by this court that if Don Lewis, Assistant United States Attorney for the Middle District of Florida,

### D.

### THE OBJECTIVES OF THE CONSPIRACIES AND SIMILARITY OF OPERATION

Defendant testified that the smuggling ventures involving the overt acts alleged in the Indiana indictment primarily involved the importation of marijuana into the United States from Colombia via the Bahamas. The ports of entry into the United States were Florida and Georgia. Moises Andrews, a Colombian, was the primary supplier of the marijuana. The defendant described his role in the smuggling ventures with Markowski, Baron, Morrison, and Brady, was to arrange the contacts in Columbia, set up the landing strips in Colombia, help distribute the marijuana in the United

States to a smaller degree, and handle the overall coordination of times and places.

In the Tampa indictment the objective of the conspiracy was the importation of marijuana into the United States from Jamaica via several routes including Cancun, Mexico, (a site not used in the 1977–1981), and the importation of cocaine into the United States from Colombia via several routes. The primary source of the Jamaican marijuana from Francisco (Paco) Riveroll and the primary source for the cocaine was the Ochoa family. Defendant's role in his smuggling ventures with Riverolls included arranging the landing strips and drop sites. His role did not involve the distribution in the United States.

The defendant admitted that a large part of the smuggling ventures going through the Bahamas in 1977 through 1981 involved the bribing of highly placed Bahamian officials. No such bribery occurred during the smuggling ventures in 1982 through 1983 since the Bahamas were not used as a primary refueling or stopping location.

The amount of cocaine involved in the smuggling attempts during 1982 and 1983 was about 1100 kilos. The only importation of cocaine from 1977 through 1981 involved 4 kilos smuggled by one James Case who gave the 4 kilos to the defendant as payment for subleasing an island to use as a refueling location in otherwise separate smuggling venture not involving the defendant.

The Tampa case involved the use of airdropping the marijuana or cocaine several times. Defendant testified to only one incident of airdropping marijuana from 1977–1981, not listed as one of the overt acts in the Indiana indictment, to which the defendant claims was unknown to the government.

The defendant further admitted that each and every smuggling venture had different agreements reached by the participants and that different people participated in the various smuggling ventures. He also admitted that the financial arrangements and percentage of profits between himself and each of his partners differed.

He further admitted that he had definite endings or falling outs with each of his partners before or at the time he started a new partnership and smuggling ventures resulting in new agreements.

DEA Agent Jacobsen also testified that it is common for smugglers or smuggling organizations to come together and agree to do a series of loads and then disband.

The objectives of the conspiracies in the two indictments were different, albeit the big objective was to smuggle illegal substances into the United States, the sources of the illegal substances were different, the locations involved in the smuggling operations were significantly different as well as the method of offloading, and the agreements between the conspirators were different.

The vehicles used in the Indiana case included: boat named the Rio Grande (steel shrimp boat), a boat named the Coral Star (wooden trawler), several cigarette boats used for offloading, 38' scarab boat, 32' cary speed boat named the Hairy Cary, steel trawler yacht named Adventurer and later renamed the Grand Celeste (this boat was involved in the 1980 Christmas Day rescue attempt and owned by Stafford Morrison), 36' Harris lobster boat named the Dolly Dimple also used during the 1980 Christmas Day rescue attempt, aircraft Beech D–18 and a DC–3, Aztec N808P, Cessna 310–N5085J, Cessna 402–N2713Y, and 206 Bell Jet Ranger helicopter.

The vehicles involved in the Tampa case included: 26' Ramponi boat, 30' Island Hopper, Westwind, a trawler with secret compartments belonging to Riveroll, several speed boats belonging to Joe Mackavuchi which were used to pick up the cooler or packages of drugs after they were airdropped, the aircraft involved included Cessna 182–N756RR, Aztec-N550US, Cessna 206, PBY plane, and two new planes purchased in 1983 for the Cancun flights.

The vehicles used during the time period between the indictments, February 1981 through February 1982, included: the Adventurer renamed the Grand Celeste, Dolly

Dimple, PBY plane, Cessna 182, Coral Star, Aztec N550US.

The method of operation in the Indiana case involved the loading of aircraft or boats with marijuana in Colombia then transporting it to the United States via a refueling stop or longer stop period in the Bahamas. In order to secure safety in the Bahamas, highly placed Bahamian officials were bribed. Defendant testified to one airdrop incident during 1977 through 1981, which he claims the government was unaware of the venture. The marijuana was imported into the United States to Florida or Georgia and then distributed.

The method of operation in the Tampa case involved the loading of marijuana in Jamaica and the loading of cocaine from deep within the Colombian borders. The drugs were then transported to the United States via direct route, Cancun, Mexico, infrequently through the Bahamas (at least not enough to require bribing officials to secure safe passage). The drugs were transported by aircraft and airdropped and then speed boats would pick up the packages or coolers and smuggle them into the United States for distribution.

It is the defendant's position that the use of the planes and boats overlapped supporting his claim that there existed but one single conspiracy. Defendant claims that although the exact same vehicles did not overlap the manner in which money was obtained to initially purchase the vehicles was the same throughout all of his smuggling ventures. He further claims that the proceeds from the sale of one vehicle was used to purchase another vehicle to be used for smuggling purposes and therefore a continuity remained and establishes an overlap of vehicles. A careful review of the record discloses that ten of the vehicles were either confiscated by the authorities, destroyed in some manner (i.e. crashed, sunk or blown up), or stolen. The Rio Grande and the Westwind were owned by Colombians. One was returned to Sunny South to sell and payoff remaining debt. One was given to Billy Albury in lieu of a money debt. One vehicle was given to the Wrinkle Construction Company, and Morrison owned the Adventurer. A few of the vehicles were purchased with money obtained from the proceeds of prior smuggling ventures, and some of the vehicles were purchased on a payment plan.

■ Although some of the proceeds from smuggling ventures or the proceeds from the sale of certain vehicles were used to purchase other vehicles used in smuggling ventures none of the vehicles used during smuggling activities during the time period of the Indiana indictment overlapped with vehicles used during the time period of the smuggling activities of the Tampa indictment. The fact that the same type of proceeds and proceeds from the sale of some vehicles were used to further defendant's smuggling operations does not conclusively prove that there existed only one single conspiracy.

With regard to the use of the smuggling venture proceeds and the proceeds received from the sale of the vehicles, it is important to look at the interdependence of the two conspiracies. From the testimony of the defendant, and the record before this court, it discloses that there was in actuality little if any interdependence of the second conspiracy on the events or proceeds of the first conspiracy. Many of the vehicles used in the smuggling ventures were owned or purchased by other conspirators, and most of the time the illegal drugs were provided to defendant before any payment was made. Although the proceeds from ventures and the sale of vehicles were used at times to purchase other vehicles used in subsequent ventures, it was never shown that defendant's ability to participate in the smuggling ventures required his own vehicles. Several times defendant would borrow money up front from a co-conspirator to purchase a vehicle to carry out a smuggling operation and then pay them for the "loan" after the venture.

■ Other than the fact that defendant was involved in the smuggling operations charged in both indictment, and the fact that smuggling was the illegal activity, and that defendant worked with other smug-

gling organizations and he maintained a role of organizer, manager, and supervisor over at least five individuals during these various smuggling ventures, there are very few similarities between the Indiana case and the Tampa case. The objective of the conspiracies were different, the participants were different, the manner of operation, i.e., vehicles used, locations used, importation methods used, and the agreements between the conspirators were different as well as the time periods were different.

The continuing criminal enterprise charged against defendant in Indiana had been complete before he was indicted in the Tampa indictment. The Indiana CCE took place from 1978 through early 1981 (as far as this defendant was involved), and the Tampa CCE took place from February 1982 through March 1983. The evidence establishes that the Indiana CCE was a different CCE than the Tampa CCE. The defendant admitted that there clearly existed more than one agreement forming the different conspiracies.

### IV.

In *United States v. Stricklin*, 591 F.2d 1112 (5th Cir.1979), at page 1117 Judge Hill stated:

*Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), held that the denial of a motion to dismiss an indictment on double jeopardy grounds results in an appealable final order. Thus, the double jeopardy issue maybe decided and appealed *before* a record of the trial on the challenged indictment is made. *Abney* may be applied without serious complexity where the indictments and the record from the previous trial are sufficiently explicit to provide for clear-cut determination of the double jeopardy claim. For example, where X is once indicted and tried for the murder of Y, a subsequent indictment charging that X murdered Y would clearly violate X's Fifth Amendment right not to be twice put in jeopardy for the same offense. Where, however, the charges in two or more indictments involve crimes such a complicated or far-reaching conspiracies, as in this case, the application of *Abney* can be troublesome, especially when one of the previous indictments did not result in a trial and the creation of a record. It is necessary, then, to establish procedural rules for an *Abney* pretrial double jeopardy hearing, so that requirements such as going forward with proof, burden of persuasion, and weight of the evidence are equitably assigned to and understood by the parties. The Third Circuit was recently confronted with an identical task in *United States v. Inmon*, 568 F.2d 326 (3d Cir.1977). We adopt their well-reasoned opinion in that case as the law in this Circuit, along with such modifications and additions as our comments may provide.

It is undisputed that the burden of going forward by putting the double jeopardy claim in issue is and should be on the defendant. It is similarly reasonable to require the defendant to tender a prima facie nonfrivolous double jeopardy claim before the possibility of a shift of the burden of persuasion to the government comes into play. Once the defendant has come forward with such a prima facie nonfrivolous claim, however, we are faced with determining whether the defendant or the government should carry the burden of persuasion from that point forward. The Third Circuit in *Inmon* concluded that the burden should then be placed on the government, basing its decision on practical considerations concerning access to proof and on the government's control over the particularity with which indictments are drafted. 568 F.2d at 329–32. *Accord, United States v. Mallah*, 503 F.2d 971 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). We agree, for similar reasons, that the burden of establishing that the indictments charge separate crimes is most equitably placed on the government when a defendant has made a nonfrivolous showing that an indictment charges the same offense as

that for which he was formerly placed in jeopardy.

*Stricklin* even if fully applicable in this Circuit, does not support this defendant's double jeopardy claim or defense.

Examined in the light of the analysis in *U.S. v. Cerro,* 775 F.2d 908 (7th Cir.1985), the record here discloses that the indictment here and the one in Tampa were for *similar* but *separate* and *distinct* offenses.

The same is true when this record is examined in light of the factual contest of *U.S. v. West,* 670 F.2d 675 (7th Cir.1982), with which this court is most familiar. The same can be said for *U.S. v. Sinito,* 723 F.2d 1250, 1255 (6th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984).

This court has been much influenced by the dissenting opinion of Judge Arlin Adams in *United States v. Sargent Elec. Co.,* 785 F.2d 1123 (3d Cir.1986) at page 1134 and takes the liberty to set out two extended quotes therefrom:

> The Fifth Amendment of the Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The bar against double jeopardy was taken from the English common law, where the concept developed as early as the thirteenth century. *See, e.g., United States v. Wilson,* 420 U.S. 332, 339–40 & n. 6, 95 S.Ct. 1013, 1019–20 & n. 6, 43 L.Ed.2d 232 (1975); *Bartkus v. Illinois,* 359 U.S. 121, 151–55, 79 S.Ct. 676, 695–697, 3 L.Ed.2d 684 (1959) (Black, J., dissenting); Kirk, *"Jeopardy" During the Period of the Year Books,* 82 U.Pa.L.Rev. 602 (1934). Among other things, the clause was designed to protect against a second prosecution for a single offense and multiple punishments for the same offense. *See North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The Supreme Court has repeatedly stressed that the guarantee against double jeopardy is "a fundamental ideal in our constitutional heritage." *Benton v. Maryland,* 395 U.S. 784, 794,

89 S.Ct. 2056, 2062, 23 L.Ed.2d 707 (1969).

\*     \*     \*     \*     \*     \*

This Court has adopted the "same evidence" test for assessing double jeopardy claims. *See United States v. Young,* 503 F.2d 1072, 1076 (3d Cir.1974). Under this test, a second indictment for an offense violates the double jeopardy clause "only when the evidence required to support a conviction upon [the offense] would have been sufficient to warrant a conviction upon" a prior indictment. *Id.* at 1075 (quoting *United States v. Pacelli,* 470 F.2d 67, 72 (2d Cir.1972). However, *Young* cautioned that application of the same evidence test "must be tempered ... with the consideration that a single conspiracy may not be subdivided arbitrarily for the purposes of prosecution." *Id.* As we explained there, "[d]ifferent alleged overt acts are not necessarily inconsistent with an improper division of a single conspiracy into multiple crimes. It is the agreement which constitutes the crime, not the overt acts." *Id.* at 1076. *See also U.S. v. Felton,* 753 F.2d 276 at 278 (3rd Cir.1985).

Other courts, noting the difficulties of applying the same evidence test in assessing claims that a second indictment on a charge of conspiracy violates the double jeopardy clause, have adopted a "totality of the circumstances" standard. *See, e.g., [U.S. v.] Korfant,* 771 F.2d [660] at 662 [2nd Cir.1985]; *United States v. Thomas,* 759 F.2d 659, 661–62 (8th Cir.1985); *United States v. Sinito,* 723 F.2d 1250, 1256 (6th Cir.1983); *cert. denied,* —— U.S. ——, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984); *United States v. Castro,* 629 F.2d 456, 461 (7th Cir.1980); *United States v. Marable,* 578 F.2d 151, 154 (5th Cir.1978). Under the totality of the circumstances approach, a court will consider the degree of overlap between the two charged conspiracies in the following factors: (1) the criminal offenses charged in the successive indictments; (2) the participants: (3) the time periods involved; (4) similarity of operation; (5)

the overt acts alleged; (6) the geographic scope of the alleged conspiracies or locations where overt acts occurred; and (7) the objectives of the alleged conspiracies. Additionally, it will look to whether any other signs of interdependence between the two charged conspiracies exist. *See Korfant,* 771 F.2d at 662; *Thomas,* 759 F.2d at 661–62. The ultimate question under the totality of the circumstances approach, as under the same evidence test, is "whether there [was] more than one agreement." *Sinito,* 723 F.2d at 1256. *See also [U.S. v.] Beachner Construction Co.,* 729 F.2d [1278] at 1281 [10th Cir.1984] (bid-rigging case); *Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942) ("The gist of the crime of conspiracy is the agreement."); *Young,* 503 F.2d at 1076.

It has taken slightly longer than this court would prefer to research and write this memorandum. The extra time was absolutely necessary to give this factual record the special attention the constitutional issue here presented demands.

It is true that this defendant painted his own continuing criminality with a very wide and long brush. At this point it serves his purpose to do so. This court can accept his factual statements as to his widespread illegal drug importing acts without accepting the legal conclusions his counsel argues automatically spring therefrom. The record does not require or compel the legal result argued for by the defendant here. The indictment now pending here for trial against this defendant is not now precluded by the Double Jeopardy Clause of Amendment V of the Constitution of the United States.

When one carefully dissects the facts stated by the defendant rather than his proffered conclusions, the former do not support the latter.

When this record is examined in light of the totality of circumstances test there was here more than one CCE and the double jeopardy clause was not here violated.

## ORDER

On the present state of the record the defendant has failed in his burden to demonstrate double jeopardy and therefore the defendant's Motion to Dismiss is DENIED with leave to renew same after a trial on the merits. Such trial is set in South Bend, Indiana, beginning on JULY 30, 1986 at 1:30 o'clock P.M. The defendant and his counsel shall personally appear before this court on JUNE 27, 1986 at 1:30 o'clock P.M. for a final status call. SO ORDERED.