# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP1977-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, |
| | Plaintiff-Respondent, |
| | v. |
| | Alexander M. Schultz, |
| | Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 385 Wis. 2d 494,922 N.W.2d 866
PDC No:2019 WI App 3 - Published

| | |
|---|---|
| OPINION FILED: | March 4, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 9, 2019 |

SOURCE OF APPEAL:
| | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Lincoln |
| JUDGE: | Robert R. Russell |

JUSTICES:
REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ZIEGLER, and KELLY, JJ., joined. HAGEDORN, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, and DALLET, JJ., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Frederick A. Bechtold*, Taylor Falls, Minnesota. There was an oral argument by *Frederick A. Bechtold*.

For the plaintiff-respondent, there was a brief filed by *Scott E. Rosenow*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Scott E. Rosenow*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2017AP1977-CR
(L.C. No. 2014CF68)

STATE OF WISCONSIN : IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent,

**FILED**

  v.

**Mar 4, 2020**

Alexander M. Schultz,

Sheila T. Reiff
Clerk of Supreme Court

      Defendant-Appellant-Petitioner.

---

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ZIEGLER, and KELLY, JJ., joined. HAGEDORN, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, and DALLET, JJ., joined.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 REBECCA GRASSL BRADLEY, J. The State charged Alexander M. Schultz with repeated sexual assault of a child for engaging in sexual intercourse with the fifteen-year-old victim, M.T.,[1] in "late summer to early fall of 2012." A jury acquitted him of this charge. Shortly thereafter, paternity test results revealed Schultz to be the father of M.T.'s child. The State then charged Schultz with sexual assault of a child under 16 years of age

---

[1] For privacy purposes, we do not refer to the victim in this case by name. See Wis. Stat. § 809.86 (2017-18).

occurring "on or about October 19, 2012," the date M.T.'s obstetrician determined the child was conceived. We review whether the State exposed Schultz to multiple prosecutions for the same offense in violation of the Double Jeopardy Clauses of the United States and Wisconsin Constitutions. Schultz asks us to consider whether a court may ascertain the scope of jeopardy in the first prosecution based upon trial testimony, as well as to determine who bears the burden resulting from any ambiguity in the timeframe of a charging document——the defendant or the State.[2]

¶2 We hold that a court may examine the entire record of the first proceeding, including the evidence admitted at trial, when determining the scope of jeopardy in a prior criminal prosecution. Because the complaint incorporated the police report, which documents a certain end date for the intercourse, and the evidence presented at Schultz's first trial did not encompass the same timeframe of the offense charged in his second prosecution, we conclude that Schultz was not twice in jeopardy for the same criminal offense. Specifically, the State's second prosecution of Schultz for sexual assault of a child under 16 "on or about October 19, 2012," did not include the same timeframe as its first prosecution for repeated sexual assault of a child in the "late summer to early fall of 2012." We affirm the court of appeals.

---

[2] We interpret Schultz's use of the word "burden" in the petition for review to ask which party should have the responsibility to overcome an ambiguous timeframe in a charging document. Due to our determination on the first question, we need not address the second.

## I. BACKGROUND

### A. Schultz's First Prosecution

¶3  In December 2012, Merrill Police Officer Matthew Waid interviewed then-fifteen-year-old M.T. after learning she was pregnant.  Waid learned that M.T. had sexual intercourse with a male named "Dominic" in early to mid-October.  M.T. also informed Waid that she had sexual intercourse with Schultz "approximately one month before she had sexual intercourse with Dominic."  M.T. confirmed that "she had her period between the time she had sexual intercourse with Alex" and when she had intercourse with Dominic in early to mid-October.  When questioned by Waid, Schultz denied having a sexual relationship with M.T.

¶4  In January 2013, Officer Waid conducted two follow-up interviews with M.T. about her sexual relationship with Schultz. In the first, M.T. claimed she and Schultz had sexual intercourse more than five times, beginning in the middle of 2012 and lasting for a few months.  Schultz was either 19 or 20 years old when the intercourse began.  In the second, M.T. showed Waid Facebook messages between her and Schultz on September 3, 2012.  In these messages, Schultz was angry and dismissive of M.T. because he believed that she was telling other people things that "can put me in prison."  Based upon these messages, the interviews with M.T., and interviews with multiple witnesses who suggested knowledge of a sexual relationship between Schultz and M.T., Waid recommended charges against Schultz.

¶5 In April 2013, the State filed charges against Schultz in Lincoln County Circuit Court[3] for repeated sexual assault of a child, a Class C felony.[4] The complaint listed the timeframe for the assaults as "late summer to early fall of 2012." Because Schultz was a repeat criminal offender with three prior convictions, the State also charged him with a penalty enhancer pursuant to Wis. Stat. § 939.62(1)(c)(2017-18).[5] The complaint "incorporated by reference" the entirety of Officer Waid's police report and attached his report to the complaint. The subsequent Information also listed "late summer to early fall of 2012" as the timeframe for the crime. During a pre-trial hearing, the parties agreed M.T.'s pregnancy was not pertinent to Schultz's trial because Dominic was presumed to be the child's father.[6]

---

[3] The Honorable Jay R. Tlusty presided.

[4] See Wis. Stat. § 948.025(1)(e). For the jury to convict under § 948.025(1)(e), it must find the defendant engaged in three separate sexual assaults, in violation of Wis. Stat. § 948.02(1) or (2), during the charged timeframe.

[5] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[6] Before trial, Schultz's counsel moved to introduce evidence of M.T.'s pregnancy as well as her claim that Dominic was the father, because he assumed M.T.'s pregnancy "was going to be part of this case" and "part of the context of the case." In response to that motion, the State moved for a continuance in order to prepare its response. Both M.T. and her mother supported the State's request for a continuance and expressed a desire to wait for the paternity test results. The State regarded the results as irrelevant, anticipating they would confirm Dominic to be the father. While Schultz indicated he wanted to see the test results, he also wanted to proceed with the trial and withdrew his motion. Both parties agreed to proceed with the trial as scheduled. The paternity test results were not available until after the first trial and therefore do not inform the determination of the scope

4

¶6 Schultz's trial took place on January 21-22, 2014. During his opening statement, the prosecutor indicated the sexual relationship between Schultz and M.T. began in the "late summer of 2012." Consistent with the prosecutor's timeframe, M.T. testified she had sexual intercourse with Schultz starting around July or between July and August, and that she and Schultz broke up around the beginning of September 2012. On direct examination, M.T. confirmed she had sexual intercourse with Schultz in the month or so leading up to the beginning of October 2012. On cross-examination, she relayed the same information she initially told Officer Waid: she had sexual intercourse with Schultz approximately one month before she had intercourse with Dominic, the latter of which took place in early to mid-October. Later in her testimony, M.T. claimed she told a friend about her sexual relationship with Schultz, and that this conversation occurred "closer to October," after she had stopped seeing Schultz.

¶7 During his testimony, Officer Waid confirmed that in the course of his initial investigation, M.T. told him she had sexual intercourse with Schultz in the month or so prior to early October 2012. He also read Facebook messages between M.T. and Schultz from September 3, 2012. These messages confirmed M.T.'s testimony regarding the relationship with Schultz ending by early September. In the messages, Schultz stated "[U]r dead to me now" and "[I] was gonna try to get back with you[.]" While not explicitly mentioning a sexual relationship, Schultz accused M.T. of breaking a promise

---

of jeopardy in the first trial.

5

to him and telling people things that could send him to prison. M.T. responded that she "didnt tell anyone."

¶8 No evidence at trial indicated M.T. and Schultz had sexual intercourse in October 2012. One of Schultz's own witnesses, A.O., testified that she and Schultz were in a romantic relationship between September 2012 and the spring of 2013.

¶9 While instructing the jury, the circuit court reiterated that the timeframe alleged for the assaults was "late summer to early fall of 2012." In closing argument, the State argued the intercourse between Schultz and M.T. ended in September. In summarizing M.T.'s testimony regarding sexual intercourse with Schultz, the State specifically mentioned that M.T. indicated intercourse occurred in the month before October 2012; the assaults started in July and ended in September 2012; and the assaults happened during "September, August, and July." After deliberations, the jury acquitted Schultz of "repeated acts of sexual assault of a child as charged in the information," which had charged Schultz with this crime during the timeframe of "late summer to early fall of 2012."[7]

---

[7] The dissent claims the court's recitation of the evidence "is not a fair picture." Dissent, ¶80. It is the dissent that relies on a slanted summary of the proceedings, ignoring dispositive facts in the record. In presenting its gloss on this case, the dissent disregards any portions of the record that counter its analysis, including:

- the police report summarizing Officer Waid's investigation, which was attached to and incorporated in the initial indictment;

6

## B. Schultz's Second Prosecution

¶10 Five days after Schultz's acquittal, Officer Waid learned from Lincoln County Victim Services that M.T. had received her paternity test results. These results indicated a 99.99998 percent certainty that Schultz, not Dominic, was the father of M.T.'s baby. Although incarcerated at the time, Schultz participated in a phone interview with Waid about the statements

---

- M.T.'s statements to Officer Waid regarding the timeline of the sexual activity with Schultz and Dominic;
- the Facebook messages exchanged between M.T. and Schultz, shedding light on the nature and timeframe of their relationship;
- the withdrawal of Schultz's request for an adjournment pending receipt of the paternity test results, based on the State's representation that M.T.'s pregnancy would not be mentioned at trial, and never was;
- Schultz's pretrial admission, in a motion to dismiss the first charge for selective prosecution, that "the complainant had sexual intercourse with at least one other adult during the time period involved" and "the other adult has admitted to sexual intercourse and has been determined to be the father of the complainant's child[]"; and
- the State's acknowledgment that "Dominic [] [has been] imputed the father of the victim's child, that's been in the reports for months as well."

The dissent can conclude the record is "unclear when the alleged sexual activity . . . stopped" only because it closes its eyes to this evidence. The dissent mistakenly asserts that the State went to trial knowing Schultz could be the father of M.T.'s child. Dissent, ¶80. In fact, M.T. told law enforcement that "she had her period between the time she had sexual intercourse with Alex" and when she had intercourse with Dominic in early to mid-October, rendering it unreasonable to suggest the State knew Schultz could be the father. Finally, the dissent points to nothing in the record to support its assertion that "late summer to early fall 2012" included "on or about October 19, 2012."

7

from his previous trial and his relationship with M.T. Schultz continued to deny having sexual intercourse with M.T. at any point during 2012. After receiving authorization from M.T. and her mother, Waid contacted M.T.'s obstetrician to obtain information regarding the date of conception. M.T.'s obstetrician informed Waid that the conception date for the baby was October 19, 2012.

¶11 In March 2014, the State filed charges against Schultz in Lincoln County Circuit Court.[8] Count 3 charged Schultz with sexual assault of a child under 16 years of age, a Class C felony, "on or about October 19, 2012."[9] The State again charged Schultz with a penalty enhancer for being a repeat criminal offender, pursuant to Wis. Stat. § 939.62(1)(c). The complaint incorporated Officer Waid's police report detailing his investigation, which was attached to the complaint.

¶12 Schultz moved to dismiss Count 3, arguing it violated his constitutional protections against double jeopardy. Because "fall" started on September 22, 2012, and October 19, 2012 fell within the first thirty days after the September equinox, Schultz argued the date alleged for his second sexual assault charge——"on or about October 19, 2012"——fell within the timeframe alleged for his first charge, which included "early fall." The circuit court denied Schultz's motion because it found no evidence of any assault

---

[8] The Honorable Robert R. Russell presided.

[9] See Wis. Stat. § 948.02(2). The complaint included two other counts: Count 1 charged Schultz with perjury in violation of Wis. Stat. § 946.31(1)(a); Count 2 charged Schultz with obstructing an officer in violation of Wis. Stat. § 946.41(1).

8

in October in the first prosecution for repeated sexual assault of a child. The circuit court found, based on the testimony adduced in the first trial, that "late summer to early fall of 2012" meant July, August, and September 2012, but not October 19, 2012.

¶13 Schultz thereafter pled guilty to Counts 1 and 3——perjury and sexual assault of a child under 16 years of age, respectively. The circuit court sentenced Schultz to two years of initial confinement plus two years of extended supervision for perjury, and five years of initial confinement plus five years of extended supervision for the sexual assault against M.T, both sentences to run concurrently.

¶14 Schultz moved for postconviction relief, again raising the double jeopardy argument he set forth in his motion to dismiss. Having concluded the defendant presented no new evidence for his argument, the circuit court denied the motion. Schultz appealed.

¶15 The court of appeals rejected Schultz's assertion that his second prosecution violated the constitutional proscription of double jeopardy and affirmed the circuit court. See State v. Schultz, 2019 WI App 3, ¶3, 385 Wis. 2d 494, 922 N.W.2d 866. The court of appeals held that the test to determine the scope of jeopardy in the face of an ambiguous charging document is how a reasonable person would understand the charging language, based on the evidence introduced at trial and the entire record of the proceeding. Id., ¶30. The court of appeals agreed with the circuit court's analysis of the evidence presented at Schultz's first trial: the sexual assaults were alleged to have occurred only in July, August, and September 2012, but not October. Id.,

¶¶33-34. Schultz filed a petition for review, which this court granted.

## II. STANDARD OF REVIEW

¶16 Whether a defendant's convictions violate the Double Jeopardy Clauses of the Fifth Amendment and Article I, Section 8 of the Wisconsin Constitution, are questions of law appellate courts review de novo. State v. Steinhardt, 2017 WI 62, ¶11, 375 Wis. 2d 712, 896 N.W.2d 700 (citation omitted); see also State v. Sauceda, 168 Wis. 2d 486, 492, 485 N.W.2d 1 (1992) (citation omitted).

¶17 As part of our analysis, we interpret Wis. Stat. § 971.29. Statutory interpretation is a "question[] of law that this court reviews de novo while benefitting from the analyses of the court of appeals and circuit court." State v. Ziegler, 2012 WI 73, ¶37, 342 Wis. 2d 256, 816 N.W.2d 238 (citation omitted).

## III. ANALYSIS

### A. Double Jeopardy Overview

¶18 The Fifth Amendment provides, in relevant part: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. The Wisconsin Constitution likewise provides protection against double jeopardy, stating "no person for the same offense may be put twice in jeopardy of punishment[.]" Wis. Const. art. I, § 8, cl. 1. We view the United States and Wisconsin Double Jeopardy Clauses as "identical in scope and purpose." State v. Davison, 2003 WI 89, ¶18, 263 Wis. 2d 145, 666 N.W.2d 1 (citation omitted). Accordingly, United States Supreme Court decisions interpreting

10

the Fifth Amendment's Double Jeopardy Clause are "controlling interpretations" of both the federal Constitution and the Wisconsin Constitution. Id. (citations omitted).

¶19 In order to apply the original meaning of the Double Jeopardy Clause, we interpret this provision "through the historical ascertainment of the meaning that it would have conveyed to a fully informed observer at the time when the text first took effect." Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 435 (2012). Unlike other constitutional protections, the right to be free from double jeopardy does not have identifiable roots in a specific legal system or a particular point in time. Whereas the writ of habeas corpus traces its origin to English common law,[10] and the Eighth Amendment's ban on cruel and unusual punishment derives directly from the English Bill of Rights,[11] the protection against double jeopardy enshrined in the Constitution represents the amalgamation of legal principles applied throughout documented history. See David S. Rudstein, A Brief History of the Fifth Amendment Guarantee against Double Jeopardy, 14 Wm. & Mary Bill Rts. J. 193, 196-202 (2005) (stating "[t]he precise origins of the guarantee against

---

[10] See State ex rel. Fuentes v. Court of Appeals, 225 Wis. 2d 446, 450, 593 N.W.2d 48 (1999) (stating that habeas relief comes from the common law).

[11] See Harmelin v. Michigan, 501 U.S. 957, 966 (1991) (Scalia, J., joined by Rehnquist, C.J.) (noting in discussion of the "cruel and unusual punishment" provision of the Eighth Amendment, "[t]here is no doubt that the [English] Declaration of Rights is the antecedent of our constitutional text.").

11

double jeopardy are unclear[,]" before discussing the legal systems upholding the doctrine). The guarantee against double jeopardy existed in the English common law, as evidenced by William Blackstone's characterization of it as a "universal maxim of the common law of England, that no man is to be brought into jeopardy of his life, more than once, for the same offence." 4 William Blackstone, Commentaries on the Laws of England 335 (1790). Even before Blackstone's recognition of the right as a "universal maxim," the English common law included the protection through the pleas of "autrefoits acquit (a former acquittal), autrefoits convict (a former conviction), and pardon." Rudstein, 14 Wm. & Mary Bill Rts. J. at 204 (footnote omitted).

¶20 Precursors to the principle against subjecting people to punishment multiple times for the same wrongful act predate the common law and are found in ancient civilizations. See, e.g., Bartkus v. Illinois, 359 U.S. 121, 151 (1959) (Black, J., dissenting) ("Fear and abhorrence of governmental power to try people twice for the same conduct is one of the oldest ideas found in western civilization. Its roots run deep into Greek and Roman times." (footnote omitted)); see also David S. Rudstein, Double Jeopardy: A Reference Guide to the United States Constitution 2-11 (2004) (tracing double jeopardy principles from the Ancient Greeks in 355 B.C.E. through Roman and canon law to the English common law, and ultimately the Fifth Amendment). In the lengthy history underlying this principle, one idea has remained constant: a subsequent prosecution must be for the "same offense" in order to violate the right to be free from double jeopardy. Rudstein,

Double Jeopardy at 2-15 ("same issue," "same offense," "same charge" in Ancient Greece; "same offense," or "one offense" in Roman law; "same thing," "same matter," or "same crime" in canon law; "same offense," "same crime," or "same identical crime" in the English common law; "one and the same crime, offence, or trespasse" in the Massachusetts Bay Colony, "same crime or offence" in the first state constitution with double jeopardy protection; "same offence" in the Fifth Amendment; "same offense" in the Wisconsin Constitution). In accord with the original meaning of the Double Jeopardy Clause, in Wisconsin, "'[t]he same offense' is the sine qua non of double jeopardy." Davison, 263 Wis. 2d 145, ¶33 (citations omitted).

¶21 The Supreme Court identified three constitutional protections provided by the Double Jeopardy Clause: (1) "against a second prosecution for the same offense after acquittal[,]" (2) "against a second prosecution for the same offense after conviction[,]" and (3) "against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717 (1969), overruled on other grounds by Alabama v. Smith, 490 U.S. 794 (1989). This case involves the first of these protections.

¶22 Over 40 years ago, we held that two prosecutions are for the "same offense," and therefore violate the Double Jeopardy Clause, when the offenses in both prosecutions are "identical in the law and in fact." State v. Van Meter, 72 Wis. 2d 754, 758, 242 N.W.2d 206 (1976) (citation omitted). Offenses are not identical in law if each requires proof of an element that the other does not. See Blockburger v. United States, 284 U.S. 299,

13

304 (1932) (citation omitted).  Offenses are not identical in fact when "a conviction for each offense requires proof of an additional fact that conviction for the other offenses does not."  State v. Lechner, 217 Wis. 2d 392, 414, 576 N.W.2d 912 (1998) (citing Sauceda, 168 Wis. 2d at 493-94 n.8; Van Meter, 72 Wis. 2d at 758).  Offenses are also not identical in fact if they are different in nature or separated in time.  State v. Anderson, 219 Wis. 2d 739, 749, 580 N.W.2d 329 (1998) (citation omitted); see also State v. Stevens, 123 Wis. 2d 303, 323, 367 N.W.2d 788 (1985) (holding offenses were not the same in fact because they were separated by a significant period in time).

### B.  The Dispute

¶23  The parties agree that the offenses in Schultz's first and second prosecutions, repeated sexual assault of a child and sexual assault of a child under 16, are identical in law.  The parties disagree as to whether the offenses are identical in fact.  Schultz argues that both offenses are identical in fact because the timeframe for the offenses charged in the first prosecution, "late summer to early fall of 2012" encompasses the date for the offense charged in the second prosecution, "on or about October 19, 2012."  Schultz contends the charging language is unambiguous and the proper inquiry considers how a reasonable person would construe the indictment at the time jeopardy attaches, without considering later evidence introduced at the previous trial.[12]

---

[12] For a jury trial, jeopardy attaches when the jury is sworn. See Wis. Stat. § 972.07(2).  Under Schultz's proposed test, the circuit court would determine how a reasonable person would construe "late summer to early fall of 2012" at the time the jury

14

Schultz also asserts that even if the charging document is ambiguous, the State bears the burden of the ambiguity as the drafter of the document.  In contrast, the State argues that when faced with ambiguous language in a charging document, courts must examine the entire record of the proceeding to clarify the scope of jeopardy.

## C.  Determining the Scope of Jeopardy

¶24  Whether courts may consider the record to determine the scope of jeopardy is a question of first impression in Wisconsin. In his reply brief, Schultz argued that the record's relevance is limited to considering only "how a reasonable person would have understood the scope of jeopardy 'at the time jeopardy attached in the first case.'"  (quoting United States v. Olmeda, 461 F.3d 271, 282 (2d Cir. 2006)).[13]  At oral argument, Schultz again conceded

_____

was sworn.

[13] The dissent suggests the point at which jeopardy attaches delimits the scope of jeopardy.  Dissent, ¶87.  This is fundamentally wrong.  The time at which jeopardy attaches does not lock in the scope of jeopardy.  Jeopardy attaches when the jury is sworn in order to prevent the State from conducting a full trial but then dismissing the charges before judgment only to refile the charges and retry the defendant until it is confident the jury will convict.  The attachment of jeopardy when the jury is sworn protects the "valued right" of the defendant "to have his trial completed by a particular tribunal."  Arizona v. Washington, 434 U.S. 497, 503 (1978) (quoted sources omitted); State v. Seefeldt, 2003 WI 47, ¶16, 261 Wis. 2d 383, 661 N.W.2d 822 (quoted sources omitted).  The rationale for this rule is well-established:

> The protection against double jeopardy limits the ability of the State to request that a trial be terminated and restarted.  This protection is important because the unrestricted ability of the State to terminate and restart a trial increases the financial and emotional burden on the defendant, extends the

15

that the record is relevant, but only to understand the minds of the parties at the time jeopardy attaches:

> The court: But counsel, isn't that . . . why we look at the rest of the record, to try to figure out what does "early fall" mean?
>
> Schultz's counsel: When . . . we look at the record, we're not looking at the record to determine whether evidence was submitted to show that there was sex in the month of October, what we're looking at is evidence of what was the common understanding of the parties as to what the timeframe was.
>
> The court: [Y]ou mentioned that we should apply the test described in Olmeda,[14]. . . it says, a court must further determine that such a conclusion would be reached by an objective arbiter. That determination will require examination of the plain language of the

---

period during which the defendant is stigmatized by an unresolved accusation of wrongdoing and may increase the risk that an innocent defendant may be convicted.

Seefeldt, 261 Wis. 2d 383, ¶17 (citation omitted). The United States Supreme Court similarly expressed the reasoning underlying this rule:

[A] second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.

Washington, 434 U.S. at 503-05 (internal footnotes omitted). The point at which jeopardy attaches has nothing to say about the actual scope of jeopardy.

[14] United States v. Olmeda, 461 F.3d 271, 275 (2d Cir. 2006).

16

> indictments in the two prosecutions, as well as the entire record of the proceedings.
>
> Schultz's counsel: And I agree with that. . . . I do acknowledge that the entire record is relevant but only relevant to the understanding at the time of jeopardy . . . .

¶25 As Schultz conceded, the entire record of the proceedings may be relevant in determining the scope of jeopardy. Contrary to Schultz's argument, however, no binding authority limits courts to using the record only to determine the subjective understanding of the parties in the first criminal proceeding at the time jeopardy attaches. Instead, substantial authority indicates courts may review the entire record of the first proceeding to determine the scope of jeopardy.

¶26 In Van Meter, we decided there was no double jeopardy violation when, after a jury trial, the trial court convicted Van Meter of knowingly fleeing a police officer in Wood County, after he was previously convicted of knowingly fleeing a police officer in Portage County, with both charges arising from the same high speed chase across county lines, in violation of the same statute. Van Meter, 72 Wis. 2d at 755-59. The defendant argued the Double Jeopardy Clause barred the second prosecution. Id. at 757. Acknowledging the "identity of legal elements" based on both prosecutions charging violations of the same statute, this court concluded that the requisite "identity in fact[] cannot be shown" because "eluding Wood county officers in Wood county" is not the same offense as "eluding Portage county officers in Portage county." Id. at 757-58. We held a double jeopardy violation exists when "facts alleged under either of the indictments would,

17

if proved under the other, warrant a conviction under the latter[.]" Id. (quoting State v. George, 69 Wis. 2d 92, 98, 230 N.W.2d 253 (1975)). Applying that test, which was originally adopted in Anderson v. State, 221 Wis. 78, 87, 256 N.W. 210 (1936), this court determined "that defendant has not been put twice in jeopardy for the same offense because proof of facts for conviction for the Wood county offense would not have sustained conviction for the Portage county offense[.]" Van Meter, 72 Wis. 2d at 759. We explicitly "emphasize[d] the importance of having all of the facts in the record" to determine whether one fact alleged under an indictment would warrant a conviction under the latter. Id. at 758. Nonetheless, because the defendant did not order any trial transcripts for the appeal, this court's review was "limited to whether the pleadings, decision, findings and conclusions sustain the judgment." Id. at 756, 758 (citations omitted). Accordingly, we assumed the evidence was sufficient to support the verdict in the Wood County conviction and we relied on the facts from the Portage County Circuit Court's decision affirming Van Meter's Portage County conviction. Id. at 758-59. Van Meter establishes the relevance of the record in determining whether a double jeopardy violation occurred.

¶27 All of the federal circuit courts of appeal that have addressed this issue have also examined the record, including evidentiary facts, in determining the scope of jeopardy. For example, in United States v. Walsh, 194 F.3d 37 (2d Cir. 1999), abrogated on other grounds by Kingsley v. Henrickson, 135 S. Ct. 2466 (2015), an indictment charged a corrections officer three

18

times for violating the Eighth Amendment by causing "unnecessary and wanton pain" to an inmate. Walsh, 194 F.3d at 40-41. The three counts alleged conduct occurring between January 4, 1991 and March 8, 1991 (Count 1); between May 26, 1992 and December 1, 1992 (Count 2); and between May 26, 1992 and July 22, 1992 (Count 3). Id. Walsh challenged the timeframes for exposing him to double jeopardy, because each count alleged the same conduct and the timeframes overlapped. Id. at 41. The Second Circuit Court of Appeals rejected his argument that the charges violated the prohibition of double jeopardy because the "evidence presented at trial" conclusively demonstrated Counts 2 and 3 were not the same and the conduct alleged in Count 3 occurred after June 5, 1992. Id. at 46. Even though the indictment charged an offense occurring between May 26th and July 22nd and it therefore appeared that the State was charging Walsh for the same criminal act during the same timeframe, the evidence admitted at trial established a break in time between the conduct charged in each count. Id.

¶28 In United States v. Castro, 776 F.2d 1118 (3d Cir. 1985), multiple defendants were charged with and convicted of conspiracy to possess with intent to distribute more than 1,000 pounds of marijuana, among other offenses, based upon attempted drug transactions in Pennsylvania, Texas, and Florida. Id. at 1120. The appellate court acknowledged a variance between the indictment and the evidence produced at trial, with the jury finding a conspiracy and attempt to purchase marijuana in Pennsylvania only. Id. at 1123. On appeal, Castro contended this variance would expose him to prosecution in Texas for the same crime. Id. The

19

appellate court disagreed, noting that "[t]he scope of the double jeopardy bar is determined by the conviction and the entire record supporting the conviction." Id. (citation omitted). The appellate court concluded "[t]he record shows clearly that the jury found that Castro conspired to possess the Bristol[, Pennsylvania] marijuana, and that the evidence supporting his conviction could not be sufficient to warrant a conviction based upon . . . transactions outside Pennsylvania." Id. at 1124.

¶29 While the Castro court framed the analysis in terms of the "record supporting the conviction," courts also examine the record in cases involving an acquittal, like Schultz's, in order to determine the scope of jeopardy. For example, in United States v. Crumpler, 636 F. Supp. 396 (N.D. Ind. 1986), the defendant was charged with multiple drug offenses in Florida, of which he was acquitted. Id. at 397-98. He was subsequently charged with multiple drug offenses in Indiana, in response to which he filed a motion to dismiss on double jeopardy grounds. Id. at 398. The Crumpler court resolved the motion "based solely on the record before it which includes all pleadings, affidavits, and the evidence adduced during that evidentiary hearing[]" on the motion to dismiss. Id. at 399. Regardless of whether the first prosecution resulted in an acquittal or a conviction, "[a] defendant claiming that he has been subjected to double jeopardy bears the burden of establishing that both prosecutions are for the same offense . . . . The defendant must show that 'the evidence required to support a conviction on one indictment would have been sufficient to warrant a conviction on the other'

20

indictment." Id. at 403 (citing United States v. Roman, 728 F.2d 846 (7th Cir. 1984); United States v. West, 670 F.2d 675, 681 (7th Cir. 1982); United States v. Buonomo, 441 F.2d 922, 925 (7th Cir. 1971)). In Crumpler, the defendant argued that all of his drug smuggling activities were part of one scheme, so the court examined the timeframes alleged in each indictment as part of its double jeopardy analysis. Id. at 399, 404-05. In doing so, that court considered both "the face of the indictments" as well as "the evidence presented during the hearing" and found nothing in the record to establish any "overlap in the time periods charged in the indictment here and the one in Tampa." Id. at 405.

¶30 The other circuits are in accord with Walsh and Castro. See United States v. Stefanidakis, 678 F.3d 96, 100-01 (1st Cir. 2012) (in reviewing a double jeopardy challenge, courts must see if the record "contains facts sufficient to supply a rational basis for a finding that [the prosecutions] were predicated on different conduct." (citations omitted)); United States v. Bonilla, 579 F.3d 1233, 1241-44 (11th Cir. 2009) (court reviews the record to determine whether convictions violated double jeopardy); United States v. Hamilton, 992 F.2d 1126, 1130 (10th Cir. 1993) ("[F]or purposes of barring a future prosecution, it is the judgment and not the indictment alone which acts as a bar, and the entire record may be considered in evaluating a subsequent claim of double jeopardy." (citation omitted)); United States v. Vasquez-Rodriquez, 978 F.2d 867, 870-72 (5th Cir. 1992) (holding the two prosecutions were not for the same offense after reviewing the evidence admitted at trial after noting that "acts as described in

21

the indictment will be examined as well as the acts admitted into evidence at the trials or hearings." (citations omitted)); United States v. Pollen, 978 F.2d 78, 84, 86-87 (3d Cir. 1992) ("[E]xamin[ing] the record to determine if [separate counts were] impermissibly multiplicitous[]" under the Double Jeopardy Clause); United States v. Am. Waste Fibers Co., 809 F.2d 1044, 1047 (4th Cir. 1987) ("When a Double Jeopardy bar is claimed, the court must examine not just the indictment from the prior proceeding but the entire record." (citation omitted)); Roman, 728 F.2d 846, 853-54 (7th Cir. 1984) ("It is the record as a whole, therefore, which provides the subsequent protection from double jeopardy, rather than just the indictment[.]"); United States v. Levine, 457 F.2d 1186, 1189 (10th Cir. 1972) ("The entire record of the proceedings may be referred to in the event of a subsequent similar prosecution. In the case at bar the record contains adequate detail to protect against double jeopardy." (internal citation omitted)). See also 1 Charles Alan Wright, Federal Practice & Procedure § 125 (4th ed. 2019) ("If a defendant claims prior jeopardy in defense to a pending charge, the court is free to review the entire record of the first proceeding, not just the pleading." (footnote omitted)).

¶31 In addition to precedent from the federal courts, historical sources support examining the defendant's actual exposure to jeopardy in a prior prosecution. "The guarantee against double jeopardy became firmly entrenched in the [English] common law in the form of the pleas of autrefois acquit (a former acquittal), autrefoits convict (a former conviction), and pardon."

22

Rudstein, 14 Wm. & Mary Bill Rts. J. at 204 (footnote omitted). If the defendant had already been acquitted, convicted, or pardoned of the offense, he could advance the appropriate plea, backed by the facts underlying the first case. The availability of these common law pleas in defense of a second prosecution confirms the historical basis for examining the record of the first prosecution to determine the scope of jeopardy. Each of these pleas focused on the actual result of the initial prosecution. A founding era dictionary reinforces the meaning of "jeopardy" as the actual danger to which a person is exposed, as opposed to the danger a person fears, defining "jeopardy" as "[h]azard; danger; peril." 1 Thomas Sheridan, A General Dictionary of the English Language (1780). Near the time the Wisconsin Constitution was adopted, Webster's Dictionary similarly defined "jeopardy" as "[e]xposure to death, loss or injury; hazard; danger; peril." Jeopardy, Webster's Dictionary (1st ed. 1828); see also John Boag, Popular and Complete English Dictionary 749 (1848) (defining "jeopardy" with verbatim language). Similarly, the current edition of Black's Law Dictionary defines "jeopardy" as the exposure a defendant actually "faces at trial." Jeopardy, Black's Law Dictionary (11th ed. 2019) ("The risk of conviction and punishment that a criminal defendant faces at trial." (emphasis added)). None of these definitions bases jeopardy on the criminal defendant's fears, beliefs, or perceptions regarding his exposure in the first prosecution, as Schultz proposes.

¶32 In light of the common law interpretations of jeopardy, as well as its historical meaning, we apply Van Meter's holding

23

and join the federal circuit courts of appeal in examining the entire record, including evidentiary facts adduced at trial, in ascertaining whether a defendant's double jeopardy rights have been violated by a second prosecution. Regardless of whether the first prosecution results in an acquittal or a conviction, it is the record in its entirety that reveals the scope of jeopardy and protects a defendant against a subsequent prosecution for the same crime. See Roman, 728 F.2d at 854 ("It is the record as a whole, therefore, which provides the subsequent protection from double jeopardy, rather than just the indictment[.]"); Wright, supra ¶30 ("If a defendant claims prior jeopardy in defense to a pending charge, the court is free to review the entire record of the first proceeding, not just the pleading." (footnote omitted)).

### D. The Record of Schultz's Case

¶33 In this case, we apply the test originally adopted in Anderson v. State and reaffirmed in George and Van Meter, and examine the entire record of Schultz's first prosecution for repeated sexual assault of a child to determine whether the "facts alleged under either of the indictments would, if proved under the other, warrant a conviction under the latter."[15] Van Meter, 72

---

[15] The dissent cites the test from State v. Anderson, 219 Wis. 2d 739, 749, 580 N.W.2d 329 (1998) but fails to apply it correctly. In conclusory fashion, the dissent simply declares that "evidence of an act of sexual assault on or around October 19 would have supported a conviction for repeated sexual assault occurring in the 'late summer to early fall[,]'" but never explains why. See dissent, ¶74. The dissent merely repeats its conclusory assertions regarding the charging language, without analysis. See dissent, ¶¶86, 90 ("evidence of an October 19 sexual assault would support a conviction" during "a timeframe including 'early fall.'"). Tellingly, the dissent ignores a critical portion of

24

Wis. 2d at 758; George, 69 Wis. 2d at 98; Anderson, 221 Wis. at 87 (quoted source omitted). Specifically, we determine whether the initial charge for repeated sexual assault of a child during the timeframe of "late summer to early fall of 2012" includes the date charged in the second prosecution for sexual assault of a child "on or about October 19, 2012."

### 1. An Unambiguous Complaint

¶34 We begin our analysis with the complaint charging Schultz in the initial prosecution. The complaint's language of "early fall," viewed alone, does not answer the question because "early fall"——standing alone——could be ambiguous.[16] However, the complaint in this case expressly incorporates by reference the attached police report of Officer Waid, which contains some detail elucidating the meaning of "early fall." The police report plainly establishes the timeframe in which Schultz was subject to jeopardy for repeated sexual assault of a child. The report identifies

---

the charging document in the first prosecution——the attached and incorporated-by-reference police report——which defines the time period for the alleged assaults, thereby lending temporal specificity to what could otherwise be an ambiguous charge.

[16] We reject Schultz's argument that fall and early fall have definitive meanings based on the earth's position in relation to the sun. Dictionaries and people define the seasons differently. See, e.g., Fall, Oxford Dictionary (6th ed. 2007) (defining fall as "the time of year when leaves fall from trees; autumn" and using the following example: "In early fall, towards the end of August, they gathered berries." (emphasis added)); Autumn, Oxford Dictionary (6th ed. 2007) ("The third season of the year, between summer and winter: in the northern hemisphere freq[uently] regarded as comprising September, October, and November," before moving to the astronomical definition Schultz advances).

Dominic——not Schultz——as the person who had intercourse with M.T. in "early to mid-October." Waid's report described M.T. as having intercourse with Schultz "approximately one month before she had sexual intercourse with Dominic." One month before early to mid-October is early to mid-September. The report details M.T. having had no "sexual intercourse with anyone between Dominic and [December 4, 2012]." The police report attached to the complaint also recounted another interview during which M.T. said she had sexual intercourse with Schultz "over five times," starting in "the middle of the year of 2012" and lasting for "a couple of months." When asked at oral argument what statements in the police report indicated intercourse with Schultz during the month of October, Schultz's counsel was unable to identify any. Counsel responded, "Well, I don't have a specific quote, but . . . she claims there are multiple incidents of sexual abuse."

¶35 Nothing in the police report mentions or even suggests sexual intercourse between Schultz and M.T. during October. The attached police report unambiguously identifies the latest date of intercourse for which Schultz was charged in the first prosecution. If, as the report indicates, M.T.'s sexual intercourse with Schultz occurred one month before her sexual intercourse with Dominic in early to mid-October, and she had no sexual intercourse between her intercourse with Dominic and December 4, 2012, then the State's charging language of "early fall" means the intercourse for which Schultz was charged concluded in early to mid-September, well before October 19, 2012. Coupled with the fact that the police report indicates M.T. had her period in between the sexual activity

26

with Schultz in mid-September and the sexual activity with Dominic in early to mid-October, the police report attached to the complaint repudiates any suggestion that "early fall" in the first prosecution encompassed October 19.

¶36 Contrary to Schultz's assertion, none of the "five times" of sexual intercourse charged in the first prosecution occurred in October.  The police report included Facebook messages between M.T. and Schultz on September 3, 2012 indicating the relationship was over on that date, offering additional confirmation that the first prosecution encompassed sexual assaults by Schultz that ended in September.  The police report, incorporated by reference into the complaint, clearly identifies Schultz's scope of jeopardy in the first prosecution at the time jeopardy attached.

### 2.  The Record At Trial

¶37  Even though the incorporated and attached police report renders the complaint unambiguous, we also review the record of the first trial to see if anything suggests "early fall" extended past mid-September to include October 19, 2012.  We do so in order to safeguard the defendant's constitutional right against double jeopardy.  The facts alleged under the second complaint——a sexual assault "on or about October 19"——would not, if proven, support a conviction in the first prosecution.  The complaint in the first prosecution alleged repeated sexual assaults during "late summer to early fall[,]" which the attached and incorporated police report clarified to have concluded in early to mid-September.  Limiting our review to the complaint, however, would not protect the

27

defendant against double jeopardy if the State introduced evidence of a sexual assault occurring "on or about October 19" after jeopardy attached.  In order to ascertain whether the defendant was exposed to double jeopardy in the second prosecution, we examine the entire record of proceedings in the first case to see if any evidence of a sexual assault occurring "on or about October 19" was introduced.[17]

¶38 The trial transcripts reveal no evidence extending the end date identified in the police report.  M.T testified at Schultz's first trial that they began having intercourse in July or August and broke up in the beginning of September 2012.  She also testified to having a conversation with a friend "closer to October," after she stopped seeing Schultz, during which she disclosed to her friend the previous intercourse with Schultz.  A

---

[17] While the dissent repeatedly insists "the defendant's protection against double jeopardy must be firmly and rigidly guarded"——a principle this court heartily endorses——the dissent nevertheless restricts its double jeopardy analysis to "the charging period allegation[,]" ignoring the charging document as a whole, as well as the record.  Dissent, ¶76.  Although this opinion explains at great length that the defendant's double jeopardy rights cannot be fully protected without examining the record of trial proceedings, the dissent does not explain why it would circumscribe the defendant's constitutional rights by ending its analysis with a review of the "the charging period allegation" alone.  Contradicting its own analysis, the dissent seems to recognize the import of reviewing the record when it hypothesizes about the consequences "if the results of the pregnancy test showing an estimated conception date of October 19 had been presented at the first trial[.]"  Dissent, ¶83.  Unremarkably, if the results of the pregnancy test had been presented at the trial, double jeopardy would foreclose the second prosecution, regardless of the charging language in the first complaint, hence the need to review not only the complaint but also the entire record in order to determine the scope of jeopardy.

witness for Schultz, A.O., testified that she and Schultz began a romantic relationship in September 2012, lasting until the spring of 2013. The State's closing argument stipulated that the intercourse between M.T. and Schultz ended in September 2012. In its rebuttal, the State identified the time period for the sexual assaults as "September, August, and July." The transcript of Schultz's first trial contains only 21 mentions of "October." Eight of those refer to intercourse with Dominic in early to mid-October. Of the remaining 13, seven refer to M.T. having intercourse in the month or so before "October 2012." Of the remaining six, four referenced procedural matters regarding motions or Schultz's prior convictions. One of the remaining two referred to the timing of a conversation M.T. had with a friend about the sexual relationship with Schultz after they had already broken up.

¶39 The lone remaining reference to the month of October came from Schultz's counsel during his opening statement, who mentioned a "bombshell that occurred sometime in October of 2012." Counsel indicated the "bombshell" was friends alerting Schultz that M.T. told others she and Schultz were in a sexual relationship. Immediately after, counsel said Schultz and M.T. exchanged Facebook messages in which she denied making the statements and "his contact with her ended shortly thereafter." However, as the trial evidence and police report show, the Facebook conversation occurred on September 3, 2012, not in October. Schultz's counsel offered no evidence suggesting a second conversation occurred in the month of October.

29

¶40 Based upon our review of the complaint and its attached police report, as well as the trial transcripts, the scope of jeopardy of Schultz's first prosecution for "late summer to early fall of 2012," ended sometime in September. We need not determine the exact date because the conduct charged in the second prosecution was "on or about October 19, 2012." It is sufficient to conclude the record does not support jeopardy attaching to Schultz for any conduct during the month of October. Because the scope of jeopardy in the first prosecution did not include the date of the assault charged in the second prosecution, the two prosecutions were separate in time and therefore not identical in fact. See Anderson, 219 Wis. 2d at 749 (holding offenses are not identical in fact if they are separated in time).

### E. Schultz's Arguments

¶41 Schultz primarily relies on three cases to support a double jeopardy violation based on the State's second prosecution. For the reasons discussed below, none of them help his case.

¶42 First, Schultz encourages us to apply the test set forth in George for a continuing crime. In George, we analyzed a complaint alleging 29 counts of sports betting, with most counts alleging continuing conduct over the span of a definite time period, such as from September 15, 1971 to January 15, 1972. George, 69 Wis. 2d at 95-96. In that case, we concluded that if one prosecution charges a continuing crime, "a conviction or acquittal for a crime based on a portion of that period will bar a prosecution covering the whole period." Id. at 98 (quoting 1 Anderson, Wharton's Criminal Law and Procedure 351 (1957))

30

(emphasis added). We affirm this principle. In George, an acquittal for conduct on December 24, 1971, would bar the State from charging the defendant again for sports betting occurring on January 1, 1972, because it was within the time period originally described in the complaint. However, the holding in George supplies no support for Schultz's double jeopardy argument because Schultz's case requires us to compare the period of time charged in each prosecution. Because the record confirms the assaults charged in the first prosecution were alleged to have occurred before the assault charged in the second prosecution, George provides no support for Schultz's double jeopardy argument.

¶43 Schultz next contends that the double jeopardy principles espoused by our court of appeals in State v. Fawcett resolve this case in his favor. In Fawcett, the State charged the defendant with two counts of first-degree sexual assault. State v. Fawcett, 145 Wis. 2d 244, 247, 426 N.W.2d 91 (Ct. App. 1988). The complaint alleged the sexual assaults of a child occurred in the "six months preceding December [] 1985." Id. The defendant challenged this time period as a violation of his Fifth Amendment right against double jeopardy. Id. at 247. The court of appeals applied our sufficiency-of-the-charge test set forth in Holesome v. State, using the second prong of the Holesome test, which asks whether conviction or acquittal of the complained-of-charge is a bar to another prosecution for the same offense. Fawcett, 145 Wis. 2d at 251 (quoting Holesome v. State, 40 Wis. 2d 95, 102, 161 N.W.2d 283 (1968)). In analyzing whether the six-month time period in the Fawcett complaint implicated double jeopardy concerns under

31

the Holesome test, the court of appeals concluded that double jeopardy was not "a realistic threat in this case." Id. at 255. Noting that the defendant's "double jeopardy protection can also be addressed in any future prosecution growing out of this incident[,]" the court of appeals explained that "[i]f the state is to enjoy a more flexible due process analysis in a child victim/witness case, it should also endure a rigid double jeopardy analysis if a later prosecution based upon the same transaction during the same time frame is charged." Id.   (emphasis added).

¶44 We agree with the court of appeals' statement in Fawcett but it does not support Schultz's double jeopardy argument. Fawcett expressly limited its "rigid double jeopardy analysis" to later prosecutions "based upon the same transaction during the same time frame[.]"[18]   Id.   (emphasis added).   In this case,

---

[18] The dissent dodges the dispositive question in this case: were the offenses charged in each prosecution separated in time? The dissent offers no answer.  Instead, the dissent merely assumes "early fall" encompasses October 19. See dissent, ¶¶83-86.  The dissent would impose "a blanket bar on subsequent prosecutions involving the same victim and the same timeframe." Dissent, ¶72. So would we.  But as explained at length in this opinion, the two prosecutions against Schultz involved different timeframes.  The police report attached to the complaint makes this clear.  The dissent claims we "construe[] the ambiguous timeframe narrowly" misstating our analysis as "implicitly conclud[ing] that 'early fall' is ambiguous." Dissent, ¶75, 85. Read in its entirety, the charging document is not ambiguous and our construction of it is reasonable, not narrow.  A "rigid double jeopardy analysis" does not mean the court must pretend the police report was not part of the complaint, as the dissent apparently does. See dissent, ¶86 ("October 19 is not clearly separate and apart from a charging period that runs through 'early fall.'").  A charging document should not be read narrowly or expansively, but reasonably and fully.  Without authority, the dissent espouses a heretofore unheard of "important principle" that "the tie goes to the runner—

32

Schultz's prosecutions involved criminal conduct separated in time. Accordingly, applying Fawcett's "rigid double jeopardy analysis" does not affect our conclusion that Schultz's second prosecution, for sexual assault of a child under 16, was beyond the end date for the repeated sexual assaults of a child charged in the first prosecution. Because the sexual assaults charged in each prosecution were separated in time, Schultz was not twice put in jeopardy for the same offense.

¶45 Finally, Schultz proposes that this court adopt the test pronounced by the Second Circuit Court of Appeals in United States v. Olmeda. In Olmeda, the defendant moved to dismiss an indictment from June 2002, charging him with unlawful possession of ammunition in Manhattan. Olmeda, 461 F.3d at 275. Olmeda had previously pled guilty to an earlier indictment charging him with ammunition possession in June 2002 "within the Eastern District of North Carolina and elsewhere." Id. Olmeda argued the conduct alleged in the North Carolina indictment, specifically the use of the word "elsewhere," subsumed the conduct alleged in the later Manhattan indictment, which therefore violated constitutional protections against double jeopardy. See id. at 277-78. The State charged Olmeda under the same statute for both offenses, leaving the determination of whether the offenses were identical in fact the central issue in the double jeopardy analysis. Id. at 279, 282.

¶46 To decide whether successive prosecutions were the same in fact, Olmeda crafted the following test: courts must decide

---

–in this case, the defendant." Dissent, ¶76. Even if this principle were valid, there is no "tie" in this case.

whether "a reasonable person familiar with the totality of the facts and circumstances would construe the initial indictment, at the time jeopardy attached in the first case, to cover the offense that is charged in the subsequent prosecution." Id. at 282. The Olmeda court went on to say that the determination "will require examination of the plain language of the indictments in the two prosecutions, as well as 'the entire record of the proceedings.'" Id. (quoting 1 Charles Alan Wright, Federal Practice and Procedure § 125 (3d ed. 1999)). Finally, Olmeda established a burden-shifting test particularized for conspiracy. Id. Under this test, the defendant must first make a "non-frivolous" and "colorable objective showing" that the two indictments charge only one conspiracy. Id. If the defendant does so, the burden shifts to the prosecution to prove, by a preponderance of the evidence, the existence of separate conspiracies and no double jeopardy violation. Id. Applying this burden-shifting analysis, the Olmeda court held the government failed to meet its burden. Id. at 289.

¶47 We decline to adopt Olmeda's "reasonable person" test.[19] As a preliminary matter, we are not bound by Olmeda, which was

---

[19] At oral argument, the relevance of Olmeda's footnote 15 was in dispute. Footnote 15, in relevant part, states:

> [W]here the government constructively narrows an indictment after jeopardy attaches only to refile the dropped charge at a later date, a variation of the problem of increased exposure arises implicating due process if not double jeopardy concerns.

Olmeda, 461 F.3d 287 n.15.

This footnote is irrelevant to Schultz's case. The dissent misrepresents this court's "approach" as "endors[ing] the idea

34

decided by the Second Circuit Court of Appeals.    On federal constitutional issues, only United States Supreme Court decisions bind the Wisconsin Supreme Court.    See Thompson v. Vill. of Hales Corners, 115 Wis. 2d 289, 306-07, 340 N.W.2d 704 (1983).    Supreme Court decisions on the Constitution's Double Jeopardy Clause are also "controlling interpretations" of our own.    Davison, 263 Wis. 2d 145, ¶18.    In contrast, decisions by the federal courts of

---

that the scope of jeopardy is limited to and reduced by the evidence presented."    Dissent, ¶87.    Not so.    As explained at length in this opinion, review of the record is necessary in order to protect the defendant from double jeopardy.    As already made clear, if the first trial produced evidence of a sexual assault occurring "on or about October 19," then regardless of the mid-September end date for the assaults alleged in the first prosecution, double jeopardy would preclude the State from subsequently prosecuting Schultz for a sexual assault occurring "on or about October 19."    In the first case, the State did not narrow its prosecution of Schultz after jeopardy attached only to refile a dropped charge at a later date.    There was no constructive amendment by the State for the purpose of pursuing a second prosecution for conduct within the timeframe of the first prosecution.    The government never dropped a charge or sought to narrow the timeframe of the first indictment.    Instead, the State merely learned of similar criminal activity occurring after the activity charged in the first proceeding ended, and charged Schultz for that later conduct, which was outside the timeframe of the first prosecution.

If the complaint charged sexual assaults occurring July 1, 2012 through November 1, 2012, but no evidence of assaults beyond September was introduced at trial, double jeopardy would preclude the State from later filing a complaint against Schultz for assaults alleged to have occurred in October. Under that scenario, the State would indeed be attempting to "constructively narrow[] [the] indictment[.]"    That is not what happened in this case. Misleadingly, the dissent clouds the distinction between "constructively narrow[ing] an indictment" for the purpose of refiling a "dropped charge" with determining what the original scope of jeopardy was in the first place.

appeal have only persuasive value to this court. See Thompson, 115 Wis. 2d at 307.

¶48 Secondly, Olmeda did not identify any legal authority for its "reasonable person" test. The pertinent section of the opinion reads:

> To determine whether two offenses charged in successive prosecutions are the same in fact, a court must ascertain whether a reasonable person familiar with the totality of the facts and circumstances would construe the initial indictment, at the time jeopardy attached in the first case, to cover the offense that is charged in the subsequent prosecution. Thus, where a defendant pleads guilty . . . .

Olmeda, 461 F.3d at 282. Olmeda cites no cases from the United States Supreme Court incorporating the "reasonable person" test into the Double Jeopardy Clause of the Fifth Amendment, and we have discovered none.

¶49 Finally, we reject Olmeda's test because the "reasonable person" standard is typically applied in common law areas such as contract and tort. See John Gardner, The Many Faces of the Reasonable Person, 131 L.Q. Rev. 563, 563 (2015) (referring to the reasonable person standard as the "common law's helpmate" and "most closely associated with the law of torts"). The double jeopardy clauses of the Fifth Amendment and Article 1, Section 8 do not include the word "reasonable" and it is a seminal canon of textual interpretation that we do not insert words into statutes or constitutional text. "Nothing is to be added to what the text states or reasonably implies (casus omissus pro omisso habendus est)." Scalia & Garner, Reading Law, supra ¶19, at 93 (2012).

36

See generally Akhil Reed Amar, Double Jeopardy Law Made Simple, 106 Yale L.J. 1807 (1997) (advocating a plain meaning approach to the Double Jeopardy Clause, under which "'[s]ame offense' means just that[,]" and employing the Due Process Clause as a backdrop). Absent direction from the text itself or the Supreme Court, we decline to read a "reasonable person" standard into the Fifth Amendment's protections against double jeopardy. Likewise, we will not read words into Article I, Section 8 of the Wisconsin Constitution. Cf. State v. Roberson, 2019 WI 102, ¶56, 389 Wis. 2d 190, 935 N.W.2d 813 ("A state court does not have the power to write into its state constitution additional protection that is not supported by its text or historical meaning.").

¶50 Applied in this case, the Olmeda test could yield different results depending upon the geographic location of the "reasonable person" who determines what "early fall" means. The "reasonable person" in Hurley, Wisconsin might perceive "early fall" to commence in late September, coinciding with changes in the color of leaves on trees and dropping temperatures. In contrast, the "reasonable person" in Madison may associate "early fall" with the opening game of the University of Wisconsin Badgers football team. The constitutional protections against double

jeopardy cannot be conditioned upon geographic location——or any other variables influencing the judge's perspective.[20]

### F.   Wisconsin Stat. § 971.29

¶51 Schultz also contends the court of appeals erred in relying on Wis. Stat. § 971.29 as a basis for reviewing the entire record.  He argues doing so is improper when it prejudices the defendant.  We agree with the court of appeals.  Wisconsin Stat. § 971.29(2) expressly allows post-verdict amendments to the pleading to conform to the proof presented at trial, with no consideration of prejudice to the defendant:

> At the trial, the court may allow amendment of the complaint, indictment or information to conform to the proof where such amendment is not prejudicial to the defendant.  After verdict the pleading shall be deemed amended to conform to the proof if no objection to the relevance of the evidence was timely raised upon the trial.

(Emphasis added.)

¶52 Only "at the trial" must the circuit court consider prejudice to the defendant of allowing an amendment to the pleading.  "After verdict the pleading shall be deemed amended to

---

[20] Although the dissent never cites Olmeda as the source, it essentially adopts its "reasonable person" test.  The dissent says "the scope of jeopardy" is "as broad as the charging language may be fairly read."  Dissent, ¶72.  The dissent does not explain what "fairly read" means (or by whose measure we define it).  The constitutional protection against double jeopardy cannot depend upon such a vague standard.  This court instead follows the rule overwhelmingly applied by other jurisdictions and reflected in the common law dating back centuries, under which courts define the scope of jeopardy by the entire record in the case, rather than how a particular judge may "fairly read" a single document filed in the matter.

conform to the proof" unless at trial, the defendant timely objected to the relevance of the evidence. The portion of Wis. Stat. § 971.29(2) addressing such post-verdict amendments of the pleading contains no prejudice qualifier. We do not read words into the statute that the legislature did not write. "Under the omitted-case canon of statutory interpretation, '[n]othing is to be added to what the text states or reasonably implies (casus omissus pro omisso habendus est). That is, a matter not covered is to be treated as not covered.'" Lopez-Quintero v. Dittmann, 2019 WI 58, ¶18, 387 Wis. 2d 50, 928 N.W.2d 480 (quoting Scalia & Garner, Reading Law, supra ¶19, at 93). "One of the maxims of statutory construction is that courts should not add words to a statute to give it a certain meaning." Fond Du Lac Cty. v. Town of Rosendale, 149 Wis. 2d 326, 334, 440 N.W.2d 818 (Ct. App. 1989) (citation omitted); see also State v. Wiedmeyer, 2016 WI App 46, ¶13, 370 Wis. 2d 187, 881 N.W.2d 805 ("It is not up to the courts to rewrite the plain words of statutes[.]"). Based on the same principle, we reject any contention that the statute implicitly excludes the amendment of dates or times in a charging document. See State v. Duda, 60 Wis. 2d 431, 440, 210 N.W.2d 763 (1973) (construing Wis. Stat. § 971.29, "[w]e are of the opinion that the sentence regarding amendment after verdict was intended to deal with technical variances in the complaint such as names and dates." (emphasis added)).

## G. Admonition

¶53 Our opinion should not be read to approve attempts by the State to use imprecise charging language in an effort to skirt

the protections against double jeopardy. As the court of appeals correctly noted, defendants faced with uncertain language in a charging document should raise the issue to the circuit court through an appropriate motion. See Wis. Stat. § 971.31 (pretrial motions including defects in the indictment); State v. Miller, 2002 WI App 197, ¶¶8-9, 257 Wis. 2d 124, 650 N.W.2d 850 (motion to dismiss based on vague or overbroad charging period and motion requesting a more definite and certain statement); Fawcett, 145 Wis. 2d at 250-51 (due process challenges to the sufficiency of an indictment).

¶54 Further, we reaffirm a principle already established in cases involving child sexual assaults: the law does not require definitive dates in charging documents in such cases. See State v. Hurley, 2015 WI 35, ¶¶33-34, 361 Wis. 2d 529, 861 N.W.2d 174. This is because children are often incapable of remembering traumatic incidents by the day, week, or month, but instead might correlate them to other events in their lives, such as holidays, birthdays, or school semesters. See id.

IV. CONCLUSION

¶55 We hold that when the State charges a defendant in a subsequent prosecution for conduct the defendant contends overlaps the first prosecution's timeframe, courts may examine the entire record of the first proceeding to determine the actual scope of jeopardy in the first proceeding. The test to determine whether the earlier timeframe included the second is not what a reasonable person would think the earlier timeframe includes. Instead, the reviewing court ascertains the parameters of the offense for which

the defendant <u>was actually in jeopardy</u> during the first proceeding by reviewing all of the evidence, testimony, and arguments of the parties.

¶56 The State's prosecution of Schultz for sexual assault of a child under 16, "on or about October 19, 2012," did not violate the double jeopardy provisions of the Fifth Amendment or Article I, Section 8. This second prosecution for sexual assault was not identical in fact to the first prosecution for repeated sexual assault of a child in "late summer to early fall of 2012." A court's determination of the scope of jeopardy in a prior criminal prosecution is based upon the entire record of the first proceeding, including the evidence introduced at trial. It is the entire record of the first proceeding that reveals the details of the offense for which the defendant was actually in jeopardy during the first prosecution. The record of Schultz's first criminal prosecution——including the indictments, the police report, and trial testimony——establish a scope of jeopardy that excludes any conduct occurring in the month of October. The two cases against Schultz did not involve the "same offence" under the Double Jeopardy Clause. We affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶57 BRIAN HAGEDORN, J. *(dissenting)*. Alexander Schultz was charged with repeated sexual assault, a criminal offense that encompasses any and all sexual assaults committed within a specified period of time. Based on the vague witness statements as well as a still-outstanding pregnancy test, the State chose a broad and imprecise charging period: "late summer to early fall." While it could have waited until it had all the evidence——most notably, the results of the pregnancy test——the State went forward anyway, and the jury acquitted. When the pregnancy test later showed Schultz was the father, the State tried again, this time charging Schultz for committing sexual assault "on or about October 19."

¶58 Our state and federal constitutions protect against two prosecutions for the same offense. When asking whether a second charge is based on the same facts, the test is whether the facts alleged under the second complaint would, if proved, support a conviction under the first complaint. See <u>Anderson v. State</u>, 221 Wis. 78, 87, 265 N.W. 210 (1936).

¶59 Applying this test, evidence of sexual assault on October 19 would have supported a conviction for repeated sexual assault during "late summer to early fall." Because those charges are for the same offense, the subsequent prosecution violated Schultz's constitutional protection against double jeopardy and should have been dismissed. I respectfully dissent.

1

I

¶60 Both the United States and Wisconsin Constitutions protect against a second prosecution for the same offense after acquittal.[1] The constitutional protection against double jeopardy features both front-end and back-end safeguards; that is, our double jeopardy cases examine whether the protection is secure both at the time an original complaint is filed and when a subsequent prosecution is brought.

¶61 On the front end, a defendant charged with a crime is entitled to be informed of "the nature and cause of the accusation against him." Holesome v. State, 40 Wis. 2d 95, 102, 161 N.W.2d 283 (1968) (citing U.S. Const. amends. V, VI; Wis. Const. art. I, §§ 7, 8(1)). When a defendant claims these rights have been violated, the court reviews the allegations in the charging document to determine "whether it states an offense to which he is able to plead and prepare a defense and whether conviction or acquittal is a bar to another prosecution for the same offense." Id.

¶62 In child sexual assault cases, these due process protections——though still required——are viewed through a "more flexible" lens. State v. Hurley, 2015 WI 35, ¶34, 361 Wis. 2d 529, 861 N.W.2d 174 (quoting State v. Fawcett, 145 Wis. 2d 244, 254, 426 N.W.2d 91 (Ct. App. 1988)). This is so because of the unique nature of these offenses. In particular, the "vagaries of a

---

[1] "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend. V. "[N]o person for the same offense may be put twice in jeopardy of punishment . . . ." Wis. Const. art. I, § 8(1).

child's memory"——i.e., the difficulty for child victims to testify regarding specific dates and details——should not allow offenders to escape punishment. See id., ¶¶33-34 (quoting Fawcett, 145 Wis. 2d at 254). Therefore, the complaint need not set forth precise allegations regarding the date any alleged crimes were committed.

¶63 Given all this, complaints alleging child sexual assault generally pass constitutional muster despite featuring more expansive and imprecise charging periods than other criminal offenses. For example, in Hurley, we concluded that a complaint charging the defendant with repeated sexual assault of the same child "on and between" 2000 and 2005 was constitutionally sufficient. Id., ¶¶10, 53; see also State v. Kempainen, 2015 WI 32, ¶¶1, 4, 361 Wis. 2d 450, 862 N.W.2d 587 (holding sufficient notice provided with charging periods of "on or about August 1, 1997 to December 1, 1997," and "on or about March 1, 2001 to June 15, 2001").

¶64 But it is also true that this charging flexibility necessitates a counterbalancing assurance——that is, because the prosecution is held to a less-exacting standard for charging period precision, the defendant's protection against double jeopardy must be firmly and rigidly guarded.

¶65 In Fawcett, the court of appeals reviewed the sufficiency of two sexual assault charges alleged to have occurred "during the six months preceding December A.D. 1985." 145 Wis. 2d at 247. In conducting its double jeopardy analysis, the court explained:

> [W]e do not conclude that double jeopardy is a realistic threat in this case. In its brief, the state concedes that Fawcett may not again be charged with any sexual assault growing out of this incident. Courts may tailor double jeopardy protection to reflect the time period charged in an earlier prosecution. Therefore, Fawcett's double jeopardy protection can also be addressed in any future prosecution growing out of this incident. If the state is to enjoy a more flexible due process analysis in a child victim/witness case, it should also endure a rigid double jeopardy analysis if a later prosecution based upon the same transaction during the same time frame is charged.

Id. at 255 (emphasis added) (citing State v. St. Clair, 418 A.2d 184, 189 (Me. 1980)). In other words, as long as the State enjoys front-end pleading flexibility, defendants are deserving of equally extensive back-end protection against any threat of double jeopardy that could arise from such flexibility.

¶66 Other jurisdictions have recognized the same dynamic in cases involving broad and vague charging language, and provide guidance for what a "rigid double jeopardy analysis" looks like.

¶67 In State v. Martinez, the Nebraska Supreme Court affirmed the need for pleading flexibility in child sexual assault cases: "It is preferable to allow the State to conduct one vigorous prosecution to protect a child rather than to bar any prosecution at all because of a child's natural mnemonic shortcomings."[2] 550 N.W.2d 655, 658 (Neb. 1996). To compensate for that, however, the State must face a "blanket bar" against any

---

[2] The Nebraska Supreme Court affirmed a lower court decision that itself cited Fawcett for the premise that "courts may tailor double jeopardy protection to reflect the time period involved in the charge in the earlier prosecution." State v. Martinez, 541 N.W.2d 406, 414–15 (Neb. Ct. App. 1995) (citing State v. Fawcett, 145 Wis. 2d 244, 255, 426 N.W.2d 91 (Ct. App. 1988)).

4

further prosecutions arising from the broad timeframe alleged in the earlier prosecution:

> The State may allege a timeframe for its allegations of sexual assault of a child in its first prosecution; as a quid pro quo to ensure that this liberty is not abused, the State must survive double jeopardy scrutiny if it attempts a second prosecution based upon the same transaction during the same timeframe. <u>Unless the offense charged in the second prosecution is clearly separate and apart from the offense charged in the first prosecution, the timeframe alleged in the first prosecution acts as a "blanket bar" for subsequent prosecutions.</u> This is the only viable means of balancing the profound tension between the constitutional rights of one accused of child molestation against the State's interest in protecting those victims who need the most protection.

<u>Id.</u> at 658 (emphasis added). Again, the blanket bar extends to all subsequent offenses unless they are "clearly separate and apart" from the timeframe charged in the first offense.

¶68 Similarly, the Maine Supreme Court decision cited in <u>Fawcett</u> explained, "[w]hen an offense charged consists of a series of acts extending over a period of time, a conviction or acquittal for a crime based on a portion of that period will bar a prosecution covering the whole period." <u>St. Clair</u>, 418 A.2d at 189 (quoted source omitted). This meant that an indictment broadly alleging the commission of embezzlement "during and between the months of November, 1973, and December, 1975," would bar a prosecution across that whole period even though the evidence presented at trial was limited to a transaction occurring on November 1, 1973. <u>Id.</u> at

188-90. These cases are not unique. This concept is a common, well-understood theme in sister courts around the country.[3]

¶69 Our repeated sexual assault statute also embodies the notion of a blanket bar unless the second charge is clearly separate and apart from the first. It expressly prohibits the State from charging a defendant with repeated acts of sexual assault (under Wis. Stat. § 948.025) and sexual assault of the same child (under Wis. Stat. § 948.02) "unless the other violation occurred outside the time period" used for the repeated acts charge. § 948.025(3) (2017-18) (emphasis added).[4]

---

[3] See, e.g., State v. D.B.S., 700 P.2d 630, 633, 635 (Mont. 1985) (explaining, in reference to charging period of "January 1, 1983 to October 28, 1983," that less charging period specificity required in cases involving sexual abuse of a child but also that double jeopardy concerns are alleviated because "[t]he State is barred by [the state constitution] from retrying the defendant for the offense to this particular victim during the time in question"), overruled on other grounds by State v. Olson, 951 P.2d 571, 577 (Mont. 1997); State v. Lakin, 517 A.2d 846, 847 (N.H. 1986) (explaining that the broad timeframe alleged in a sexual assault does not implicate fear of the possibility of double jeopardy because "[c]ourts may tailor double jeopardy protection to reflect the scope of the time period charged in an earlier prosecution"); State v. Altgilbers, 786 P.2d 680, 695 (N.M. Ct. App. 1989) ("Because of the scope of the indictment in this case, the state would not be permitted in the future to charge defendant with any sexual offenses involving his two children during the time encompassed by the counts in the indictment."); State v. Wilcox, 808 P.2d 1028, 1030, 1033-34 (Utah 1991) (explaining, in reference to charging period of "on or between January, 1985, and September 4, 1987," that although less charging period specificity is required when young children are involved, "[o]nce a prosecutor chooses to prosecute on such vague allegations, a necessary quid pro quo under our constitutional notice provision is that to protect the defendant from double jeopardy, the prosecutor should be precluded from bringing further charges that fall within the general description of the charging allegations").

[4] All references to the Wisconsin Statutes are to the 2017-18 version.

6

¶70 The same front-end flexibility authorizing broad charging periods in child sexual assault cases also supports vague or imprecise charging periods. See, e.g., People v. LaPage, 53 A.D.3d 693, 694-95 (N.Y. App. Div. 2008) (finding child sex offense charging period of "late summer or early fall of 2006" provided constitutionally sufficient notice). It appears that cases stemming from vague charging language are rare. Even so, the same complementary principles should apply. When imprecise allegations are considered for double jeopardy purposes, any imprecision must be read at its broadest to ensure that the subsequent offense is clearly separate and apart. This guarantees that the State's pleading flexibility is not acting as both a sword and a shield against the defendant.

¶71 The Maine Supreme Judicial Court applied this principle in a case where a defendant challenged a sexual assault indictment on double jeopardy grounds because the indictment charged him with a "sexual act," a general statutory term that was elsewhere statutorily defined as any of several different forms of behavior. State v. Hebert, 448 A.2d 322, 326 (Me. 1982). The court rejected the defendant's front-end double jeopardy claim based on the indictment. The vague charge, the court explained, means the scope of jeopardy in any subsequent prosecution is commensurately vast, encompassing anything fairly included within the charging document:

> Because that statutory language may mean, under [the statutory definition], several different forms of behavior, that allegation in this indictment is ambiguous. It is clear, however, that when a defendant is placed in jeopardy under a valid indictment, he or

7

she may not thereafter be placed in jeopardy for <u>any</u> <u>offense</u> of which he properly could have been convicted under that indictment. <u>The scope of jeopardy created by</u> <u>an indictment is therefore as broad as that indictment</u> <u>may be fairly read.</u> The ambit of the constitutional bar to subsequent prosecution is co-extensive with the scope of jeopardy created in the prior prosecution. Thus, <u>if</u> <u>the allegations in one prosecution describe an offense</u> <u>which is shown to be within the scope of the charging</u> <u>allegations of a prior prosecution, then the defendant</u> <u>may successfully raise a defense of former jeopardy to</u> <u>the subsequent proceedings</u>.

<u>Id.</u> at 326 (second and third emphases added) (citations omitted).

¶72 Putting this all together, a "rigid double jeopardy analysis" necessarily depends on the specific charging language of a given case. This case-specific approach recognizes that the State has more pleading flexibility in child sexual assault cases because of the unique nature of such offenses. Where that relaxed standard leads to expansive and imprecise allegations, the State must be held responsible for any flexibility it exercises when those same allegations are considered from a double jeopardy perspective. This means a broad charging period must be paired with a blanket bar on subsequent prosecutions involving the same victim and the same timeframe. And vague allegations should likewise be coupled with a scope of jeopardy as broad as the charging language may be fairly read.

II

¶73 This common-sense approach matches the test we set forth 84 years ago in <u>Anderson</u>. Where the issue is whether the charges are identical in fact, double jeopardy is violated if the facts alleged under the second complaint would, if proved, support a conviction under the first complaint. See <u>Anderson</u>, 221 Wis. at

8

87; see also State v. George, 69 Wis. 2d 92, 98, 230 N.W.2d 253 (1975) (applying Anderson); State v. Van Meter, 72 Wis. 2d 754, 758, 242 N.W.2d 206 (1976) (same). The logic of this test is apparent. If allegations of a subsequent prosecution describe an offense that falls within the scope of jeopardy in an earlier prosecution, the defendant is twice subject to conviction and punishment for the same conduct. This the constitution does not allow.

¶74 Applying this test, the proper question is whether evidence of an act of sexual assault on or around October 19 would have supported a conviction for repeated sexual assault occurring in the "late summer to early fall." Reading "early fall" as broad as it may be fairly read, with the whole record in view, the answer is yes.

¶75 The majority comes out the other way, its logic proceeding in three steps. First, although it doesn't explicitly say so, it implicitly concludes that "early fall" is ambiguous. Then, it determines that this ambiguity should be resolved by looking to the entire record to determine what "early fall" meant in the context of the original prosecution. Finally, it concludes that the police report attached to the complaint and evidence presented at trial show "early fall" meant, in effect, mid-September.[5]

---

[5] The majority says it is not concluding the charging language is ambiguous. Majority op., ¶44 n.18. We can quibble over the descriptor for what the majority is doing, but there would be no need to explore the record to define an end date not chosen by the State if the complaint was clear on its face.

¶76 I agree with the majority that the whole record may be consulted to determine the scope of jeopardy defined by ambiguous charging language.[6] But the important principle the majority loses sight of is that the tie goes to the runner——in this case, the defendant. This is so because any imprecision in the phrase "early fall" is a product of the pleading flexibility that allows vague charging language like this in the first place. Looking to the record of the original proceeding shows that it was unclear when the alleged sexual activity between M.T. and Schultz stopped. This in turn led the State to allege a broad and imprecise end point for the repeated sexual assault charge consistent with the very lack of precision reflected in the evidence it had. Although the majority finds a date certain (mid-September) in the police report and testimony, that's not the charging period allegation. The

---

[6] As the majority aptly points out, examining the record is appropriate and necessary to determine the scope of jeopardy in certain circumstances. For instance, the entire record has been used to define the parameters of an underlying offense like a conspiracy that "seldom will be clear" from the charging document alone. See, e.g., United States v. Crumpler, 636 F. Supp. 396, 403 (N.D. Ind. 1986) (quoting United States v. Castro, 629 F.2d 456, 461 (7th Cir. 1980)). Or it may assist when the evidence at trial presents a variance from the language in the charging document. See, e.g., United States v. Hamilton, 992 F.2d 1126, 1129-30 (10th Cir. 1993) (explaining that the whole record would protect against double jeopardy where a variance existed between charging language and the evidence produced at trial); United States v. Castro, 776 F.2d 1118, 1123 (3d Cir. 1985) (discussing a defendant's broader double jeopardy protection when the evidence supporting his conviction was considerably narrower than the language in the indictment).

The parties in this case do not disagree on whether the record may be consulted; they simply part ways over how such information can be used.

State instead chose an undefined seasonal end point ("early fall"), one that matched the temporally imprecise information that was shared by witnesses throughout the underlying investigation. The State's strategic decision to select a vague end point for the charging period should not be newly defined by this court to be a narrower date certain.

¶77 The investigation into sexual assault against fifteen-year-old M.T. began in December 2012 precisely because she was pregnant. The investigating officer turned his attention to twenty-year-old Alexander Schultz after M.T. stated in interviews that the two of them had sex multiple times. Schultz denied a sexual relationship with M.T. He stuck with that story even after the investigating officer informed him that M.T. was pregnant and "may believe that [he] is the father of the child."

¶78 Schultz was eventually charged with committing at least three acts of sexual assault against M.T. in the "late summer to early fall of 2012." As part of his defense against that charge, Schultz moved the court to order a paternity test. On the morning of trial, the results of that test were still an open question. M.T. wanted the trial to be continued until the father's identity was known. Her mother supported that plan.

¶79 Schultz previously had also hoped to postpone the trial in anticipation of the paternity test results. However, after M.T. and her mother made their desires known, Schultz reversed course and asked to proceed with trial that day. The court agreed, and a jury found Schultz not guilty. Four days later, the paternity test results came in, revealing that Schultz was the

11

father of M.T.'s child, with an apparent conception date of October 19, 2012.

¶80 As an initial matter, the conception-inducing sexual assault is what commenced the investigation that led to Schultz's original prosecution in the first place. The majority's assertion that everyone agreed the pregnancy was not pertinent at trial is not a fair picture. Majority op., ¶5. While the State seemingly entered trial presuming that Schultz was not the father, it was certainly not certain about that. Instead, the State went to trial with the evidence it had, knowing all the while that Schultz could be the father.

¶81 Moreover——and this is important——if the evidence was clear that no sexual activity occurred after mid-September, the State could have charged Schultz accordingly. As the majority tells it, the police report itself definitively excludes any conduct occurring in the month of October. Majority op., ¶34. Yet, instead of so charging, the State chose to use the vaguer and less precise language, "early fall." Why? Because that is the imprecise language witnesses used throughout the initial investigation,[7] and undoubtedly the State hoped to capture the full array of evidence that could have emerged at trial to support a conviction.

---

[7] For instance, M.T.'s neighbor informed the investigating officer that she had seen Schultz at M.T.'s residence numerous times "around the summer to early fall area" of 2012. Another friend of M.T.'s told the officer she was aware of sexual interactions between M.T. and Schultz that had "occurred during the late summer, early fall area of 2012."

¶82 By casting a wider net, the State was empowered to present evidence of any and all acts occurring during the entire charging period that supported its charge of repeated sexual assault. But it must also live with the reality that any new evidence of sexual assault during that time period would be unavailable for a second prosecution. Again, case after case after case explains that charging flexibility on the front end equals exacting double jeopardy protection on the back end.

¶83 Returning to our long-established test, charges are factually identical if facts alleged under the second complaint would, if proved, support a conviction under the first complaint. See Anderson, 221 Wis. at 87. Applying this test, the benchmark that proves the point is this: if the results of the pregnancy test showing an estimated conception date of October 19 had been presented at the first trial, that evidence would have supported a conviction for repeated sexual assault during the charging period without any need for the State to amend its complaint. The same would be true if M.T. testified that she and Schultz had sex through the middle of October——that is, testimony that merely days later would be proven true by way of the pregnancy test results.

¶84 The majority dismisses this as a hypothetical, and then says that if evidence of an October 19 sexual assault was introduced at the first trial, Schultz's second prosecution would be barred under double jeopardy. Majority op., ¶37 n.17. This is true, but misses the point being made in this dissent. If the majority is correct that the ambiguous phrase "early fall" meant nothing beyond mid-September, then an effort by the State to

13

introduce evidence of an October 19 sexual assault would have required amending the complaint. Why? Because that date, the majority concludes, was outside the original charging period.

¶85 The key difference between the majority and my own view is that the majority draws on the record to establish a date certain that the State did not delineate for what was actually a deliberately vague and imprecise charging period. The majority construes the ambiguous timeframe narrowly, whereas I believe a proper protection of Schultz's constitutional right to be free from double jeopardy requires us to construe such ambiguity against the State. This is the "rigid double jeopardy analysis" that the State must endure. Fawcett, 145 Wis. 2d at 255. While this seems deferential to the defendant, that is precisely the point.

¶86 Reading the charging language as broad as it may be fairly read, evidence of an October 19 sexual assault would support a conviction during a timeframe including "early fall." As Schultz points out, October 19 is, from an astronomical perspective, early fall; it occurs in the first full month of the astronomical season of fall. While this is not conclusive, it is a fair reading of how early fall can be understood. October 19 is not clearly separate and apart from a charging period that runs through "early fall."[8]

---

[8] The majority responds that a "charging document should not be read narrowly or expansively, but reasonably and fully." Majority op., ¶44 n.18. As explained above, however, a reasonable and full reading of vague and imprecise charging language requires ensuring that the defendant is given the benefit of the State's imprecision. While the majority may describe what it is doing as reasonably reading the charging language, it is in fact identifying a narrower date certain the State never chose.

14

¶87 Problematically, the majority's approach in this case seems to endorse the idea that the scope of jeopardy is limited to and reduced by the evidence presented. But jeopardy is "[t]he <u>risk</u> of conviction and punishment that a criminal defendant faces at trial." <u>See</u> <u>Jeopardy</u>, <u>Black's Law Dictionary</u> (11th ed. 2019) (emphasis added). Here, that jeopardy attached when the jury was sworn. <u>State v. Moeck</u>, 2005 WI 57, ¶34, 280 Wis. 2d 277, 695 N.W.2d 783. Schultz was therefore at risk of conviction and punishment based not solely on the evidence presented at trial, but on the evidence that <u>could have been</u> presented under the charge as brought. On the other hand, if the scope of jeopardy is now defined simply by "the evidence, testimony, and arguments of the parties," nothing stops that definition from shrinking until it resembles only the evidence presented. Majority op., ¶55. That is not consistent with the protections provided by our state and federal constitutions.[9]

¶88 The Second Circuit emphasized the danger of constructive amendments of this kind in <u>United States v. Olmeda</u>, warning that double jeopardy is threatened when broad or imprecise charging language is implicitly narrowed after the fact based on the lack of certain evidence:

> The law recognizes constructive amendment of an indictment to broaden a defendant's criminal exposure as a "serious error." In general, a constructive amendment

---

[9] Moreover, it makes little sense for our courts to determine whether the allegations in a charging document are sufficient to protect against a subsequent prosecution on the front end if the ensuing proceedings will effectively redefine those allegations based on the evidence presented. <u>Holesome v. State</u>, 40 Wis. 2d 95, 102, 161 N.W.2d 283 (1968).

narrowing the scope of an indictment is not troublesome because it does not similarly increase a defendant's criminal exposure. But where the government constructively narrows an indictment after jeopardy attaches only to refile the dropped charge at a later date, a variation on the problem of increased exposure arises implicating due process if not double jeopardy concerns.

461 F.3d 271, 287 n.15 (2d Cir. 2006) (citations omitted).

¶89 The majority suggests that fear of this threat is misplaced because the State never sought to narrow or amend its first charge against Schultz. Majority op., ¶47 n.19. No formal amendment occurred; this is true, but it's not the danger Olmeda flags. Olmeda's warning is aimed at exactly what the majority does here——not formal amendment, but constructively narrowing a charge based on evidence presented after jeopardy attaches.

¶90 In short, because evidence of a sexual assault on or about October 19 would have supported a conviction in his first trial without the need to amend the charging period in the complaint, the State's second prosecution violated Schultz's constitutional protection against double jeopardy. The State chose to charge Schultz for repeated sexual assault over a time period with a vague and ambiguous end point. It is inconsistent with a vigorous protection against double jeopardy to construe that ambiguity to conform to the more limited evidence presented, rather than to construe it broadly to encompass the very evidentiary indeterminacies that caused the State to pick an indeterminate timeframe in the first place. Reading the charging language as broad as it may be fairly read, evidence of an October 19 sexual assault would support a conviction over a timeframe

16

including "early fall." Accordingly, Schultz's conviction should be vacated and the charge dismissed.

¶91 I am authorized to state that Justices ANN WALSH BRADLEY and REBECCA FRANK DALLET join this dissent.